In the

# United States Court of Appeals

### For the Seventh Circuit

---

No. 03-3483

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROBERT A. BURKE,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 CR 1049—**Rebecca R. Pallmeyer**, *Judge.*

---

ARGUED FEBRUARY 9, 2005—DECIDED SEPTEMBER 28, 2005

---

Before BAUER, EASTERBROOK, and ROVNER, *Circuit Judges.*

BAUER, *Circuit Judge.* Defendant-Appellant Robert Burke was charged in a superseding indictment with six counts of perjury before a grand jury, pursuant to 18 U.S.C. § 1623. A petit jury convicted him of all but the third count, and he was sentenced to 20 years' imprisonment. He challenges both his conviction and his sentence on appeal. We affirm his conviction but vacate his sentence and remand for resentencing pursuant to *United States v. Booker*, 125 S.Ct. 738 (2005).

## I. Background

This case involves Burke's efforts to disguise his role in facilitating the failed escape attempt of fellow inmate Jeffrey Erickson from the Dirksen Federal Building on June 20, 1992. On November 1, 1991, Burke was arrested for stealing money from a bank account and detained at the Metropolitan Correctional Center ("MCC") in Chicago. He was assigned to the 17th floor, where he met inmates Jeffrey Erickson, Richard Luttrell, Thomas Hogan, and Humberto Gil-Vidarte ("Gil"). Chong Won Tai, a Korean businessman, was an inmate on the 19th floor. Burke met Tai in December 1991, and they socialized regularly for the next several months. During that time, Burke offered to have his parents smuggle into the MCC a handcuff key that he would sell to Tai for $10,000; he also suggested to Tai that the basement of the Dirksen building was the best place to attempt an escape. Tai declined Burke's offer but found another proposal more attractive. Burke offered to connect Tai with a lawyer who for $350,000 would bribe Tai's judge, and Tai agreed. Burke told Tai that the attorney's driver would swing by Tai's wife's house to collect the first payment of $100,000. The driver stopped by and Tai's wife made the payment, but neither the attorney nor his law firm received the money.

Burke offered to perform services for other inmates, as well. For example, he told Gil that he could obtain a passport for him for $25,000, but Gil declined; Burke also offered to get Gil some bad medicine as part of a plot to sue the Bureau of Prisons, but Gil chose not to pursue the matter. In addition, Burke offered to bribe Hogan's judge for $10,000, but Hogan declined.

In June 1992, Burke passed Tai a note which stated that "exciting things" were about to happen to Erickson. The next month, Luttrell was visiting Erickson's cell when Erickson revealed a small, rounded object that he held

between his thumb and forefinger; he gestured with the object and told Lutrell, "I can leave at any time." Around the same time, Luttrell overheard Erickson arguing with Burke about a key being overpriced, which caused Burke to respond: "If it wasn't for me, you wouldn't have it." Gil saw them arguing, too, and heard Erickson yell, "Don't worry. I am going to pay you." He then heard Burke ask: "If you got what you wanted, why can't I get what I want?" When Gil later inquired about the argument, Erickson told him that Burke sold him something and had increased the price. Gil asked what he had bought, and Erickson showed him a small object with a silver shaft that he had hidden in his shoe; Gil recognized it as a handcuff key. Erickson told Gil that Burke had gotten the key by hiding it under a table in the visiting room.

On July 20, 1992, Erickson was on trial at the Dirksen building. At the end of the day, he was brought to the building's basement to be transported back to the MCC. While in the elevator, Erickson freed himself from his handcuffs. When the door opened, he overpowered a deputy U.S. Marshal and seized her revolver. As he ran through the garage area of the basement, he shot and killed U.S. Marshal Roy Frakes and fatally wounded Court Security Officer Harry Belluomini. Erickson himself was wounded, and he shot himself in the head. A handcuff key was found next to his body.[1]

Word of Erickson's fate quickly reached the MCC. Luttrell heard Burke boast that the escape attempt "proves that if you want anything done in Cook County, you got to see me." Burke's mood darkened, though, after he was interviewed by the FBI as part of its investigation into the source of the

---

[1] The government introduced evidence at trial that none of the officers present during the escape attempt were missing keys to the handcuffs that they carried.

handcuff key. Immediately after his interviews, Burke told Tai to destroy anything he had with Burke's name on it.

On September 14, 1992, Burke pleaded guilty in his bank theft case and was sentenced to two concurrent five-year terms of imprisonment and two concurrent five-years terms of supervised release. On July 8, 1994, he was paroled after serving approximately half of his custodial sentence. He fled the jurisdiction in the months that followed, and on November 30, 1994, a warrant was issued for his arrest. On September 4, 1998, Burke was arrested in London. Burke fought his extradition to the United States for two years, but the British courts ultimately ordered him extradited for violating the terms of his supervised release.

Burke was returned to the United States on December 22, 2000. Upon his arrival, he was subpoenaed to testify before the grand jury investigating the Erickson escape attempt. Burke was then sent back to the MCC, where he became a friend of inmates Fred Rock and James Taylor. Burke told them he had gotten Erickson a handcuff key through his mother and was supposed to receive between $5,000 and $9,000 for it. On October 2, 2001, Burke was granted immunity from prosecution for the escape attempt and testified before the grand jury; he denied that he knew anything about Erickson's handcuff key or that he had helped procure it.

On December 5, 2001, Judge Lindberg determined that Burke should not have been sentenced to supervised release for his bank theft conviction because the offense occurred before the relevant provisions of the United States Sentencing Guidelines took effect. Pursuant to this finding, the judge held the supervised release portion of Burke's bank theft sentence void *ab initio*, and ordered Burke's immediate release. That same day, Burke was arrested and charged with committing perjury before the grand jury. On November 21, 2002, a jury convicted Burke of perjury, and he was sentenced.

## II. Discussion

Burke raises numerous issues on appeal. We will address each in turn.

### A. International Law Claims

Burke first argues that the district court should have dismissed the indictment because (1) his prosecution for perjury violated the Rule of Specialty contained in the extradition treaty between the United States and England, and (2) the vacatur of his supervised release sentence undermined the basis for his extradition and thus stripped the court of jurisdiction. We review both claims *de novo*. *Matta-Ballesteros v. Henman,* 896 F.2d 255, 258 (7th Cir. 1990).

The jurisdictional argument confuses subject-matter jurisdiction with jurisdiction over the person. Subject-matter jurisdiction is furnished by 18 U.S.C. § 3231, which covers all criminal prosecutions under the United States Code. Personal jurisdiction is supplied by the fact that Burke is within the territory of the United States. Whether he came to this nation in a regular manner does not affect the court's authority to resolve the criminal charges against him. See *United States v. Alvarez-Machain*, 504 U.S. 655 (1992). This means that we need not decide whether Judge Lindberg was right to alter the sentence imposed before Burke's flight from the United States, or whether the British judiciary acted correctly in holding that the extradition treaty called for his return to this nation.

As for the Rule of Specialty: *Matta-Ballesteros* holds that extradition treaties do not create personal rights enforceable by criminal defendants. 896 F.2d at 259. Instead they create rules for the relations between nations. The United States (represented by the President and his Cabinet) believes that the charges against Burke are proper under

our treaty with the United Kingdom, because the crime for which he is being prosecuted occurred after his extradition. Article 12(2) of the relevant treaty provides that the rule limiting prosecution to the offense for which extradition has been granted "shall not apply to offenses committed, or matters arising, after the extradition." Extradition Treaty between the United States and United Kingdom, June 21, 1977, 29 U.S.T. 227, T.I.A.S. No. 8468. The United Kingdom has not expressed dissatisfaction with this view and, had it done so, diplomacy rather than litigation would have been the way to resolve the disagreement. The question for the Judicial Branch of this nation is simply whether Burke committed the crime of which he has been accused.

## B. Perjury Trap

Burke next argues that the district court erred in denying his motion to dismiss the indictment on hit theory that the prosecution called him before the grand jury for the purpose of producing perjured testimony. According to the Ninth Circuit, a "perjury trap" is created when "the government calls a witness before a grand jury for the primary purpose of obtaining testimony from him in order to prosecute him later for perjury." *United States v. Chen*, 933 F.2d 793, 796 (9th Cir. 1991). We have not embraced this doctrine, however—see, *e.g.*, *United States v. Devitt*, 499 F.2d 135, 140 (7th Cir. 1974); *United States v. Nickles*, 502 F.2d 1173 (7th Cir. 1974)—and do not see any reason to adopt it now.

Why would a prosecutor be forbidden to give a suspect an opportunity to commit the crime of perjury? Investigators offer opportunities to commit many offenses and may lead people toward their commission. Usually the offers concern drugs, weapons, or bribery, but the principle is not limited to these offenses. If the inducement is so powerful that it amounts to entrapment by overcoming the will of a person

not already predisposed to commit the offense, while providing the means to a person who could not have committed the crime without assistance, then criminal punishment is not proper. *United States v. Hollingsworth*, 27 F.3d 1196 (7th Cir. 1994) (*en banc*). But if the suspect is predisposed to commit the offense, and could have committed it without assistance, prosecution and conviction are appropriate. See, e.g., *Mathews v. United States*, 485 U.S. 58 (1988); *Hampton v. United States*, 425 U.S. 484 (1976); *United States v. Murphy*, 768 F.2d 1518 (7th Cir. 1985). Burke has not raised an entrapment defense; his predisposition to lie is obvious, and he did not need the government's aid in order to tell a lie. Indeed, it is knowledge of a suspect's predisposition to commit a crime that, according to the Ninth Circuit, makes it wrongful for the prosecutor to offer the opportunity. Yet that turns the entrapment defense on its head, and giving the defense a new name ("perjury trap") does not permit a court to contravene governing decisions such as *Mathews* and *Hampton* that treat predisposition as permitting, rather than blocking, criminal punishment.

Should inducement to commit perjury differ from inducement to commit other offenses? Until recently some appellate courts held that an "exculpatory no" could not be prosecuted as a crime, but *Brogan v. United States*, 522 U.S. 398 (1998), disapproved that doctrine. The court observed that there are many ways to challenge the government's right to ask questions, but that lying is not among the valid ways. Just so here: If he deemed the prosecutor's questions before the grand jury improper for any reason, Burke could have refused to answer and obtained a judicial decision on the subject. Instead he chose to lie, and he must live with the consequences of that choice.

Another potential difference between perjury and other crimes is that only a request for material information can be the basis of a perjury charge. Burke does not contend,

however, that the prosecutor's questions were immaterial to a subject within the grand jury's legitimate concern. There is no statute of limitations for murder, so finding and prosecuting accomplices to Erickson's conduct was a proper subject of an ongoing examination. That the prosecutors knew (or thought they knew) the answers to the questions they asked Burke does not make the information less material. Confirming tentatively held views— or uncovering information that will refute them—is altogether appropriate. See, *e.g.*, *United States v. R. Enterprises*, 498 U.S. 292 (1991). So the grand jury was entitled to seek Burke's knowledge. That prosecutors strongly suspected that Burke would lie rather than reveal his knowledge does not make the questions improper, let alone enable him to escape the punishment that attaches to deceit when the grand jury is entitled to hear the truth.

## C. Evidence of Prior Bad Acts

Burke contends that the district court erred by admitting evidence of his prior bad acts as proof that he committed perjury. The evidence proffered by the government included testimony from inmate Tai that Burke had offered to obtain for him a handcuff key in return for $10,000 and to connect Tai with a lawyer who could influence a judge in return for $350,000. The evidence also included testimony from inmate Gil that Burke had offered to obtain for him a passport and medicine that would make him sick and thus more likely to receive a reduced sentence. In addition, the district court admitted evidence that Burke faced substantial financial obligations as a result of his conduct prior to incarceration, which his mother helped him pay while he served his sentence. We review the district court's evidentiary rulings for abuse of discretion. *United States v. Williams*, 238 F.3d 871, 874 (7th Cir. 2001).

While evidence of a defendant's prior bad conduct may not be admitted for purposes of showing action in conformity therewith, it may be used to show motive or a common scheme or plan pursuant to Federal Rule of Evidence 404(b). *United States v. Montani*, 204 F.3d 761, 767 (7th Cir. 2000). We have held that evidence of prior bad acts is admissible where:

> (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury's finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*United States v. Bursey*, 85 F.3d 293, 296 (7th Cir. 1996). Burke contends that the proffered evidence failed to satisfy any of the above prongs and that the district court applied the wrong standard of proof in its analysis of the third prong.

Burke's overarching claim is that the government's evidence had nothing to do with whether he committed perjury. The district court disagreed, and so do we. In order to prove its case, the prosecution had to demonstrate, among other things, that Burke lied when he told the grand jury that he never procured a handcuff key for Erickson. As the district court noted, the prior bad acts evidence proffered by the government was directed toward establishing Burke's motive to obtain money from inmates and his methods of doing so. The evidence was sufficient to support a jury's finding that Burke had in fact made the prior offers. Further, Burke's prior conduct—including his offer to sell inmate Tai a handcuff key—was similar enough and close enough in time to be relevant to Burke's discussions with Erickson.

Burke's primary challenge, however, goes to the standard of proof that the district court applied in analyzing the third-prong. The third prong of the test provides that prior acts evidence is admissible when it "is sufficient to support a jury finding that defendant committed [the] similar act." *United States v. Long*, 86 F.3d 81, 83 (7th Cir. 1996). The district court interpreted that rule to mean that prior acts evidence is admissible where the jury could find "by a preponderance" that the defendant committed the similar act. The court's interpretation was consistent with the holding in *Huddleston v. United States*, 485 U.S. 681 (1988), where the Supreme Court rejected the clear and convincing evidence standard previously applied by this and other courts and held that the preponderance standard is appropriate for determining the admissibility of prior acts evidence. *Id.* at 690. In *Huddleston*, the relevance of the 404(b) evidence hinged on a conditional fact determination. *Id.* Burke argues that *Huddleston* is inapplicable where the relevance of the 404(b) evidence is conditioned upon the defendant having actually committed the similar act. He maintains that in situations where the government proffers evidence relating to a substantive offense that neither a judge nor a jury had previously determined was committed, 404(b) evidence is admissible only if a jury could determine "beyond a reasonable doubt" that the defendant committed the similar act.

The district court applied the correct standard under the facts in this case. The government sought to introduce 404(b) evidence to establish that Burke *offered* to perform various services, not to establish that he in fact performed those offers. Notably, Tai never accepted Burke's offer to obtain a handcuff key, and Gil declined Burke's offer for a passport and medication.[2] The government did not

---

[2] Tai did accept Burke's offer to connect him with an attorney
(continued...)

introduce the evidence for the purpose of proving that Burke performed these offers, but rather to show his method of operation. Because Burke's offers were not substantive offenses, the fact that they were made did not have to be proved beyond a reasonable doubt. However, if we were to assume for the sake of argument that the court applied the incorrect standard, then the error was harmless in light of the testimony given by inmates Rock and Taylor that Burke admitted to them that he had procured a smuggled handcuff key for Erickson. Trial Tr. at 1625-32, 2157-60, 2257.

### D.  Immunity for Burke's Mother

Burke contends that the government's refusal to grant his mother immunity from prosecution prevented her from providing important exculpatory testimony on his behalf and thus distorted the trial's fact-finding process.[3] He claims that his mother was prepared to testify that neither she nor her deceased husband ever had conversations with Burke about bringing a handcuff key or contraband into the MCC. We review refusals to grant immunity to a defense witness for abuse of discretion. *United States v. Hooks*, 848 F.2d 785, 799 (7th Cir. 1988).

The United States Attorney has authority to grant immunity to a witness; federal courts, by contrast, play only a ministerial role in ensuring that this power is properly

---

[2]  (...continued)
who could supposedly bribe Tai's judge, but this service was never performed either.

[3]  Burke also maintains that his mother did not testify because the district court lulled him into thinking that the stakes at trial were low. This argument merits no discussion in light of Burke's hard-fought legal battles to avoid extradition.

exercised. *George*, 363 F.3d at 671-72. Criminal defendants have a fundamental due process right to present witnesses who will testify on their behalf. *Hooks*, 848 F.2d at 799. What is more, these witnesses must be free to testify without fear of retaliation. *See, e.g.*, *Webb v. Texas*, 409 U.S. 95, 98 (1972) (reversing a conviction where the trial judge's warnings to the defendant's only witness deterred him from testifying). The prosecutor's broad discretion to refuse immunity is limited by the defendant's due process rights. *United States v. Schweihs*, 971 F.2d 1302, 1315 (7th Cir. 1992). A defendant's due process rights are violated when the prosecutor abuses his authority to immunize witnesses with the intention of distorting the fact-finding process. *Id.* Although a federal court cannot order the government to immunize a defense witness, courts can dismiss an indictment where the prosecutor's refusal to grant immunity has violated the defendant's right to due process. *United States v. Herrera-Medina*, 853 F.2d 564, 568 (7th Cir. 1988).

Burke maintains that the government's decision to withhold immunity from his mother denied him access to exculpatory evidence and thus violated his due process rights. Burke, however, has failed to make the "substantial evidentiary showing" that is required to succeed on his claim. *Hooks*, 848 F.2d at 802. As an initial matter, prosecutors have significant discretion to decline immunity to a witness, particularly one who—like Mrs. Eileen Burke— could be charged for perjury. *Id.* ("It is well within the discretion of a prosecutor . . . to decline immunity to a witness who could be charged for false statement and perjury."). Moreover, as the district court observed, there is no evidence that the government threatened Mrs. Burke or sought to intimidate her. *See, e.g., Webb*, 409 U.S. at 97-98 (finding due process violation where judge singled-out witness for lengthy admonishment of dangers of perjury). Instead, there are indications that her decision not to testify may have been strategic. For example, her attorney once

advised her to invoke her Fifth Amendment rights if questioned about the handcuff key. Trial Tr. at 2350. She had also made demonstrably false statements about always visiting her son in the presence of his father which the government could have used to attack her credibility. Trial Tr. at 1472-73. The prosecution's refusal to absolve witnesses of their responsibility to testify truthfully does not impermissibly distort the fact-finding process. *See United States v. Taylor*, 728 F.2d 930, 935 (7th Cir. 1984) (finding that prosecutor's decision to revoke immunity of witness who testified falsely was not in bad faith and thus within bounds of discretion). We find that the prosecutor did not abuse his discretion in refusing to grant Mrs. Burke immunity.

### E.  Prosecutorial Misconduct

Burke argues that the government presented testimony to the grand jury and at trial that was untrue and then failed to correct the statements. The government's knowing use of false testimony, or failure to correct testimony, violates due process. *United States v. Thomas*, 987 F.2d 1298, 1300 (7th Cir. 1992) (citing *Giglio v. United States*, 405 U.S. 150, 153 (1972)); *United States v. Bontkowski*, 865 F.2d 129, 133-34 (7th Cir. 1989); *see also United States v. Williams*, 504 U.S. 36 (1992). However, we will not set aside a verdict and order a new trial unless the defendant establishes that: (1) the prosecution's case included perjured testimony; (2) the prosecution knew or should have known of the perjury; and (3) there is a reasonable likelihood that the false testimony could have affected the judgment of the jury." *Shasteen v. Saver*, 252 F.3d 929, 933 (7th Cir. 2001). We review the district court's refusal to dismiss the indictment or to grant a new trial based on prosecutorial misconduct for an abuse of discretion. *United States v. Sandoval*, 347 F.3d 627, 631 (7th Cir. 2003). In conducting our

analysis, we must accept the district court's findings of fact unless they are clearly erroneous. *United States v. Balistrieri*, 779 F.2d 1191, 1225 (7th Cir. 1985).

### 1. Tai's Trial Testimony

Tai testified at trial that he had met Burke's parents three times in the visiting room of the MCC. Following his conviction, Burke moved for a new trial. He claimed that the government knew Tai's testimony was false because Tai and Burke lived on different floors of the MCC and, according to the MCC standard schedule, had different visiting days. The district court found that Tai had not testified falsely because, regardless of the standard schedule, MCC visiting records and Tai's contemporaneous calendar notes reflected that Tai was in fact present in the visiting room on four separate occasions when one or both of Burke's parents were present. R. at 200: 9. The court offered as a possible explanation the fact that Tai claimed to be able to visit any time he wanted with "Korean attorneys" who had nothing to do with his case but were often in the building. *Id.*; Tr. at 1115-16. In addition, the court found that there was no likelihood that Tai's testimony had any affect on the jury because it was tangential to the government's case. R. at 200: 9.

Burke argues that the only reasonable explanation for the apparent discrepancy in the MCC standard schedule on the one hand and the MCC visiting records and Tai's calendar on the other is that Tai lied, because inmate visits with attorneys were typically not conducted in the main visiting room. The discrepancy is mysterious, but we agree with the district court's conclusions. Moreover, there is no reason to believe that Tai's testimony had any impact on the jury whatsoever. The comment was a brief aside that Tai made during cross-examination that proved nothing more than

the fact that Burke was visited by his parents, which was undisputed. Consequently, the court's denial of Burke's motion for a new trial was not an abuse of discretion.

### 2. Special Agent Hardgrave's Grand Jury Testimony

Burke also claims that the district court erred in failing to dismiss the indictment after FBI Special Agent Richard Hardgrave testified falsely before the grand jury. A grand juror asked Agent Hardgrave whether the FBI's investigation had uncovered any information implicating someone other than Burke's parents as the source of the handcuff key. Agent Hardgrave responded that the FBI "had no further leads" regarding how Burke had obtained the key. He also stated that "we haven't had any statement from any other people indicating anyone else" but Burke's parents smuggled the handcuff key into the MCC. Burke argues that this testimony was false because several individuals had made statements to the FBI about the possible source for the handcuff key. The district court determined that Agent Hardgrave had not testified falsely because the FBI had concluded that the other leads were unreliable. R. at 137: 12-13. The court also noted that the grand jury was not misled because Agent Hardgrave acknowledged that the FBI had no real proof that Burke himself had the key. *Id.* at 13.

Burke challenges the district court's conclusion with evidence of additional leads that the FBI had but which Agent Hardgrave failed to disclose to the grand jury. For example, statements were made that the key came from an MCC guard named Huff and that Erickson purchased the key from a person in Cicero, Illinois. We are unpersuaded. The government obtained the information about Officer Huff *after* Agent Hardgrave testified and received the lead on the second theory only the week before

Hardgrave testified, which explains why Agent Hardgrave might not have known about it. Thus, there is no evidence that the court abused its discretion in denying Burke's motion to dismiss the indictment.

## F.  The Jencks Act Claim

Burke argues that the district court thwarted his right to cross-examine the government's witnesses by denying his request for the government witnesses' pre-sentence reports. He maintains that the district court's failure to produce the reports constituted a violation of the Jencks Act, 18 U.S.C. § 3500, and entitles him to a new trial. We review the district court's denial of a motion requesting the production of witness statements for abuse of discretion. *United States v. Wables*, 731 F.2d 440, 447-48 (7th Cir. 1984).

The Jencks Act provides in relevant part:

> After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.

18 U.S.C. § 3500(b). The Act defines a statement as "a written statement made by said witness and signed or otherwise adopted by him." 18 U.S.C. § 3500(e)(1). We have recently held that the Act does not require disclosure of the pre-sentence reports of cooperating witnesses to defendants, as they do not qualify as "statements" within the meaning of the Act. *United States v. McGee*, 408 F.3d 966, 974 (7th Cir. 2005). Our decision in *McGee* also stated our commitment to safeguarding the confidentiality of pre-sentence reports. *Id.* at 973. We noted, however, that if a defendant believes that a pre-sentence report contains *Brady* material, he may request that the district court review the report *in*

*camera* to ascertain whether his suspicions have merit. *Id.* at 974 (citing *United States v. Anderson*, 724 F.2d 596, 598 (7th Cir. 1984)).

Although it is unclear from the briefs, Burke appears to have made a blanket request for the pre-sentence reports of approximately 15 of the government's witnesses. Pretrial Trans. 10/15/02 at 17. The transcript of the pretrial proceeding reveals that the district court had some misgivings about the request and did not believe that she had authority to order other judges to produce defendants' pre-sentence reports. *Id.* at 78. Yet, rather than close the door completely on Burke's request, the court directed Burke to obtain the reports from the individual judges. *Id.* at 82. The court acknowledged that this might take some time and expressed that she might grant Burke additional time if he needed it. *Id.* at 78. Although Burke's attorney stated that he would try to comply with the court's order, there is no evidence that he submitted further requests for the materials. *Id.* at 82. In light of our ruling in *McGee*, the breadth of Burke's request, and his lack of diligence, we find that the court's denial of Burke's motion was not an abuse of discretion.

### G.  The Materiality of Count Two

Burke contends that Count Two of the superseding indictment was immaterial to the grand jury's investigation and therefore should have been dismissed. Count Two charged Burke with perjury based on the following question and answer:

> Q.  Did you ever tell an inmate that you could smuggle contraband into the MCC?

> A.  No, I did not.

R. at 21. Burke maintains that the word "ever" in the count implicates statements that he made not only before

Erickson's escape attempt, but also afterward. Because the grand jury's investigation was limited to crimes that occurred "before and during Erickson's escape attempt," *id.*, Burke argues that his statements after the escape attempt were immaterial. Whether a statement is material for purposes of perjury is a mixed question of law and fact which we review *de novo*. *United States v. Gaudin*, 515 U.S. 506, 511-14 (1995).

To be perjurious, a defendant's testimony must be material to the grand jury's investigation. *United States v. McComb*, 744 F.2d 555, 563 (7th Cir. 1984). Materiality in this context is broadly defined as a statement's "effect or tendency to impede, influence, or dissuade the grand jury from pursuing its investigation." *Id*. Even potential interference with a line of inquiry can establish materiality. *Id*. The government can establish materiality by identifying a nexus between the defendant's purportedly false statement and the scope of the investigation. *Id.* at 564.

Rock and Taylor were inmates with Burke at the MCC after he was extradited. They testified that Burke told them he had smuggled the Erickson handcuff key into the MCC several years prior. Trial Tr. at 1625-32, 2157-60, 2257. The testimonies given by Rock and Taylor were clearly material to the grand jury's investigation because they spoke directly to the issue of how Erickson escaped. By the same token, Burke's denial that he told Rock and Taylor that he could smuggle contraband into the MCC was material because it had the potential to deflect suspicion that he procured the handcuff key for Erickson. Even though Burke made his statements to Rock and Taylor several years after the escape attempt, those statements related back to the time period that was material to the grand jury's investigation. The district court correctly determined that Count Two was material to the investigation and denied Burke's motion to dismiss that count from the indictment.

**H. Sufficiency of the Evidence**

Burke argues that the evidence presented at trial was insufficient to sustain his convictions, particularly his conviction for Count Five. This court reviews a jury's determination for sufficiency of evidence "in the light most favorable to the government and uphold[s] a jury's decision if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Albarran*, 233 F.3d 972, 975 (7th Cir. 2000) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We will overturn a jury's verdict only if we find that "the record contains no evidence, no matter how the evidence is weighed, from which the jury could have found guilt beyond a reasonable doubt." *Id.* at 975. We review the district court's evidentiary rulings for abuse of discretion. *Williams*, 238 F.3d at 874.

There is no question that the record contains sufficient evidence in support of Burke's conviction on each of the five counts of perjury. There was abundant testimony that Burke offered to smuggle into the MCC a wide range of contraband, including handcuff keys. Further, inmates Rock and Taylor testified that Burke told them that his mother played a critical role in bringing into the building the handcuff key that Erickson used in his escape attempt. Moreover, several inmates stated that they saw and heard Erickson and Burke arguing in the days immediately prior to the escape attempt about a debt and the outrageous price of an item that Burke had provided.

Burke focuses on Count Five because it required that the jury find not merely that he *told* others that he had provided Erickson with the handcuff key, but that he had in fact procured the key for Erickson. The questions and answers contained in Count Five read as follows:

Q. Did you provide Mr. Erickson with a handcuff key?

A. No, I did not.

Q. Did you assist in any way in making a handcuff key available to any inmate in the MCC?

A. No, I did not.

R. at 21. This admission to Rock and Taylor provided the jury with a rational basis to conclude that Burke was lying when he denied providing Erickson with the handcuff key. Furthermore, the jury was adequately instructed that they had to find each perjury element, including the false nature of the declaration contained in Count Five, beyond a reasonable doubt. We are convinced that the government's evidence was sufficient to support a conviction on Count Five.

Burke also contends that the evidence was insufficient because the government's entire case was based upon the unreliable testimony of inmates who stood to benefit from cooperating with the government. Again, we disagree. It is not the business of this court to second-guess the jury's credibility determinations. The jury had sufficient reason to find that the testimony given by the government's witnesses was credible. Tai, Lutrell, and Hogan had all been released from prison by the time they testified, so they had little or nothing to gain by testifying. Also, their stories, along with those of their fellow inmates, were corroborated. For example, Tai, Rock, and Taylor corroborated their testimony with contemporaneous documents that they had either written themselves or received from Burke. Significantly, the two sets of inmates—the first set who knew Burke at the MCC before his initial release on parole and the second set who met him after he was extradited—had never met each other and had served their sentences at different times. Despite that fact, the testimonies they gave were remarkably consistent. For these reasons, we believe that the government's evidence was credible and sufficient to support the jury's decision to convict Burke on five counts of perjury.

### I. The *Booker* Claim

Burke argues that his sentence violated the Sixth Amendment as interpreted in *United States v. Booker*. The district court sentenced him to 240 months' imprisonment pursuant to the Sentencing Guidelines. Because Burke was being sentenced for perjury, the Guidelines directed the district court to apply the guideline relevant to the criminal offense with respect to which the defendant gave false testimony. U.S.S.G. § 2J1.3(c)(1). The court chose to apply the cross-reference for aggravated assault, which generated a base offense level of 15. U.S.S.G. § 2A2.2(a). The court's application of the aggravated assault guideline triggered additional enhancements for more than minimal planning (2 points), discharge of a firearm (5 points), and bodily injury (6 points); however, the guideline capped the cumulative adjustment for the firearm and bodily injury enhancements at 9 points. U.S.S.G. § 2A2.2(b). That yielded an offense level of 26, which the court reduced to 20 because Burke was an accessory after the fact. *Id.* The district court then applied enhancements for obstruction of justice (2 points, § 3C1.1), official victim (3 points, § 3A1.2(a)), and reckless endangerment (2 points, § 3C1.2), as well as upward departures for disruption of a governmental function (2 points, § 5K2.7) and the deaths of Officer Belluomini (2 points) and Officer Frakes (2 points). All told, the adjustments yielded a total offense level of 33.

Next, the district court selected a criminal history category. The Guidelines indicated that a criminal history category IV was appropriate because Burke committed the offenses while under court supervision. The court, however, believed that would significantly under-represent Burke's criminal past and likelihood of recidivism. Accordingly, the court departed upward to a criminal history category V, which—in combination with the total offense level of 33—generated a sentencing range of 210 to 262 months. The court sentenced Burke in the middle of that range.

The district court stated in her sentencing memorandum that the Guidelines "directed" her to apply a cross-reference guideline. This suggests that the court applied the Guidelines in a mandatory fashion, which we now know was error. *United States v. Castillo*, 406 F.3d 806, 823 (7th Cir. 2005). Burke, however, preserved this argument below by objecting to his sentence on the grounds that it violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000), which presaged *Booker*. Thus, we review for harmless error. *United States v. Schlifer*, 403 F.3d 849, 854 (7th Cir. 2005). An error is harmless only if it did not affect the district court's choice of sentence. *Id.* (citing *United States v. Smith*, 332 F.3d 455, 460 (7th Cir. 2003)). While the court gave thoughtful consideration to its choice of a cross-referencing guideline and indicated its approval of several of the enhancements, the government has not established that the court would impose the same sentence had the Guidelines been merely advisory. *See United States v. Larson*, 417 F.3d 741, 746-47 (7th Cir. 2005) (recognizing that the government bears the burden of establishing that error was harmless). Because the court's error was not harmless, we vacate Burke's sentence and remand for resentencing consistent with *Booker*.

### III.  Conclusion

For the foregoing reasons, we AFFIRM Burke's conviction but VACATE his sentence and REMAND to the district court for resentencing consistent with *Booker*.

No. 03-3483                                                          23

A true Copy:

    Teste:


_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*