In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1415

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

MARVIN CHAPMAN,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 CR 783 — **Virginia M. Kendall**, *Judge*.

ARGUED NOVEMBER 28, 2012 — DECIDED AUGUST 28, 2014

Before WOOD, *Chief Judge*, and KANNE and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. On a foggy night in Chicago, police officers patrolling the west side of the city spotted Marvin Chapman walking down a sidewalk carrying a bag with what looked like the barrel of a rifle protruding from it. As the officers approached, Chapman ducked into an abandoned duplex. One officer followed Chapman into the house and saw him drop the bag in the living room; another caught up with

Chapman as he tried to escape through a bedroom window. In the bag they found a distribution quantity of heroin and an assault rifle.

Chapman was charged with three crimes: possessing heroin with intent to distribute, possessing a firearm in furtherance of a drug-trafficking crime, and possessing a firearm as a felon. At trial he claimed that the officers were either mistaken or lying about having seen him carrying the bag. He testified that he did not possess the bag at any time; it was either in the building before he entered or was planted there. His girlfriend, who was present and witnessed these events, also testified that he was not carrying a bag. The jury returned a factually inconsistent verdict, convicting Chapman of possessing the drugs but acquitting him on the two gun-possession counts.

Chapman challenges his conviction on three grounds. First, he contends that the judge erroneously admitted the details of his prior heroin-trafficking conviction under Rule 404(b) of the Federal Rules of Evidence for the purpose of proving that he knew how heroin is packaged and intended to distribute the drugs found in the bag. Second, he argues that the judge erroneously precluded him from explaining his six prior felony convictions. The convictions (though not their factual details) were admitted for impeachment purposes. Chapman wanted to blunt the impact of this evidence by telling the jury that he had pleaded guilty and accepted responsibility in his earlier cases, but the judge wouldn't allow it. Finally, Chapman challenges the judge's refusal to compel the testimony of an eyewitness who might have supported his version of events. The witness was facing drug charges in a separate case and

invoked his Fifth Amendment privilege against self-incrimination. Chapman insists that the witness had no legitimate fear of self-incrimination and should have been required to testify.

We agree with Chapman's first claim of error: The judge should not have admitted the details of Chapman's heroin-trafficking conviction under Rule 404(b). As explained in our recent en banc opinion in *United States v. Gomez*, No. 12-1104, 2014 WL 4058963 (7th Cir. Aug. 18, 2014) (en banc), evidence of other bad acts is inadmissible to show character or propensity but may be admitted for another purpose *provided* that the evidence is relevant under a theory that does not rely on an inference about the actor's propensity. *See* FED. R. EVID. 404(b)(1). Here, the judge allowed the government to use the specifics of Chapman's prior heroin conviction to prove knowledge and intent, but the relevance of the evidence on those issues depends entirely on a forbidden propensity inference. Even if the evidence was relevant in a non-propensity way, its probative value was substantially out-weighed by the risk of unfair prejudice given that Chapman's defense was that he did not possess the bag *at all*. *See* FED. R. EVID. 403. The jury's inconsistent verdict shows that the Rule 404(b) error was not harmless.

That alone requires remand for retrial. For completeness, however, we also conclude that the judge wrongly excluded Chapman's rehabilitation testimony but properly accepted the eyewitness's invocation of his privilege against self-incrimination.

## I. Background

Chapman has a long criminal record and has spent much of his adult life incarcerated. When the events in this case transpired, he had been out of jail for only about a month.

On the evening of March 8, 2010, a heavy fog enveloped the City of Chicago. The Chicago Weather Center reported dense fog at 11:06 p.m. Other weather records established that visibility was 0.1 miles or less, causing the cancellation of around 90 flights at Chicago airports. One defense eyewitness described the fog as thick. In contrast the Chicago police officers involved in Chapman's arrest—Officers McHale, Lipka, McGrory, and Bouch—did not remember any fog that night.

The four officers testified that they were on patrol in an unmarked squad car near the corner of Ohio Street and Ridgeway Avenue on the city's west side when they spotted Chapman walking south on Ridgeway. The officers were driving east on Ohio and observed Chapman from a distance of about 150 feet (at the farthest point) to 25 feet (at the nearest point). They testified that Chapman was carrying a dark-colored bag with a cylindrical object—a rifle, they thought—sticking out of it. When Chapman saw the approaching officers, he fled into an abandoned two-flat building at 619 North Ridgeway.

Chapman's account differs. He testified that he was standing on the street near the intersection of Ohio Street and Ridgeway Avenue with his girlfriend, Damuriel Collier. With

them was Derrick Lewis, an alleged drug dealer also known as "D.C." Collier, who also testified at Chapman's trial, admitted that she was talking to Lewis about selling cocaine for him. When they saw the unmarked police car approaching, Chapman and Collier walked into the abandoned flat, and Lewis walked away in another direction. Chapman and Collier both testified that at no time—either before or after entering the building—did Chapman possess a bag.

As Chapman and Collier disappeared into the house, Officers McHale and Lipka jumped from the patrol car and gave chase. McHale ran around the side of the house and down a gangway, while Lipka entered the house through the front door. The building was unlit, but Lipka carried a flashlight. He testified that he saw Chapman drop the bag in the living room and then attempt to jump out of a bedroom window. He also recalled hearing a "thud" as the bag hit the ground. Lipka alerted McHale, who saw Chapman coming through the window and detained him.

Chapman's account again differs. Chapman and Collier testified that a police officer with a flashlight banged on the front door of the house, and Collier opened the door for him. Collier also said she heard breaking glass in the rear of the building. They agreed that Chapman jumped—or tried to jump—from a window.

Chapman also introduced evidence that Officer McHale's account was not physically possible. A photo taken sometime *after* Chapman's arrest showed a rusted and partially broken fence blocking the gangway that McHale said he used to access the side of the building; a similar photo taken sometime *before*

the arrest also showed a fence blocking the passageway. Collier testified that the fence was in place on the night of Chapman's arrest. Putting this evidence together, Chapman argued that the fence was blocking the gangway on March 8, 2010, and McHale could not possibly have accessed the passageway as he claimed.

There were other unexplained discrepancies as well. Collier testified that the police handcuffed her at the scene, put her in a police vehicle, questioned her, and eventually let her go. Officer McHale testified that no female witness was taken into custody. Collier is not listed as a witness on any police report.

Officer Lipka searched the bag (on closer inspection, it turned out to be a dark blue laundry bag) and found a loaded AR-15 assault rifle and two plastic bags containing 28 foil packages of heroin, slightly over 10 grams in total weight. No fingerprints were found on the gun, and the few usable prints on the drug packaging did not match Chapman's. One of the officers searched Chapman and found three small bags of marijuana and $9 in cash.

The officers recalled that another female was present in the abandoned house, but only one of them spoke with her. After determining that she was not a safety concern, the officer told her to leave. No police report mentions this woman.

Chapman was indicted for possessing heroin with intent to distribute, 21 U.S.C. § 841(a)(1); possessing a firearm in furtherance of a drug-trafficking crime, 18 U.S.C. § 924(c)(1)(A); and possessing a firearm as a felon, *id.* § 922(g)(1). His theory of defense was that he never possessed the bag, let alone the drugs and gun inside it. He claimed that he never physically

held the bag, never controlled it, and prior to his arrest had never seen it before. It was either already in the abandoned house when he entered or it was planted.

Before trial the government moved to admit the details of Chapman's 2006 conviction for possessing heroin with intent to distribute for the purpose of proving Chapman's knowledge and intent. The government planned to cross-examine Chapman about his six prior felony convictions for impeachment purposes as permitted under Rule 609, but the motion in limine sought permission to introduce the specifics of the 2006 heroin-trafficking conviction as substantive evidence under Rule 404(b).

Chapman responded that his knowledge and intent were not really at issue because his defense was that he never possessed the bag in the first place. He offered to stipulate that the heroin found in the bag was distribution quantity, so whoever possessed it intended to distribute the drugs. Under these circumstances, he explained, the only purpose for admitting this evidence would be to show that he had a propensity for dealing heroin.

The judge granted the government's motion, apparently under the impression that Chapman was denying that he intended to possess or distribute the heroin found in the bag. The government extensively cross-examined Chapman about the specifics of his 2006 heroin conviction. Some of the prosecutor's questions elicited testimony about Chapman's familiarity with heroin packaging; others asked about the mechanics of selling the drug.

The government also impeached Chapman with his six prior felony convictions. Consistent with the requirements of Rule 609, however, these questions were limited to the fact that he had been convicted of crimes. Still, this line of inquiry featured prominently in the government's cross-examination. For example, the prosecutor's first question to Chapman was, "Sir, you're a drug dealer?" Other questions included: "Mr. Chapman, is it fair to say that you are a criminal who's been convicted of both drugs and violence?" And, "Wouldn't it be fair to say that you're a six-time convicted felon?"

In an attempt at rehabilitation, defense counsel sought to elicit testimony from Chapman that he had pleaded guilty in each of his prior cases because he was in fact guilty. The point was to set up an argument that Chapman's acceptance of responsibility was suggestive of honesty, minimizing the harmful effect of his criminal record on his credibility. The judge sustained the government's objection and disallowed this line of questioning.

Chapman's counsel also subpoenaed Lewis to testify about the events of March 8, expecting him to corroborate Chapman's and Collier's testimony that they were standing on the street near the abandoned duplex when the police arrived at the scene and that Chapman did not have a bag with him. But Lewis was facing charges of drug dealing stemming from his own arrest on March 9, 2010. He invoked his Fifth Amendment privilege against self-incrimination.

Chapman asked the judge to compel Lewis's testimony, assuring the court and Lewis's counsel that direct examination would entail only a few questions and would concentrate on

whether Chapman was carrying a bag. This limited line of inquiry, Chapman insisted, would not raise the possibility of self-incrimination. Lewis's attorney, with support from the government, continued to resist the subpoena, explaining that even if Chapman's direct examination would not risk self-incrimination, the government's cross-examination very well might. For example, any questions about his use of the nickname "D.C." could be self-incriminating in his own case because his use of aliases was at issue there. And the government might also question him about whether he had been talking to Collier about selling drugs.

In response to these concerns, Chapman suggested that the court limit the government's cross-examination. The judge rejected this solution, holding instead that Lewis had a good-faith fear of self-incrimination and could not be compelled to testify. Chapman asked the court to require Lewis to take the witness stand and invoke his Fifth Amendment privilege in front of the jury. The judge rejected this request as well and released Lewis from the subpoena.

The jury returned an inconsistent verdict, convicting Chapman of possessing heroin with intent to distribute but acquitting him on the two firearm counts. The court imposed a sentence of 210 months, and this appeal followed.

## II. Discussion

### A. Admission of Other-Act Evidence

Chapman first challenges the district court's decision to admit the specifics of his 2006 conviction for possession of

heroin with intent to distribute. He argues that this evidence served no purpose other than to show that he had a propensity to deal heroin, in violation of the prohibition in Rule 404(b) against using other-act evidence to prove propensity. Alternatively, he argues that this evidence should have been excluded under Rule 403.

As we explained in our recent en banc decision in *Gomez*:

> Rule 404(b) excludes relevant evidence of other crimes, wrongs, or acts if the purpose is to show a person's propensity to behave in a certain way, but other-act evidence may be admitted for "another purpose," including, but not limited to, "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

2014 WL 4058963, at *6 (quoting FED. R. EVID. 404(b)(2)). We also repeated some earlier cautionary words about admitting evidence of a defendant's other drug-related crimes in a drug prosecution like this one: "Especially in drug cases … , other-act evidence is too often admitted almost automatically, without consideration of the 'legitimacy of the purpose for which the evidence is to be used and the need for it.'" *Id.* at *4 (quoting *United States v. Miller*, 673 F.3d 688, 692 (7th Cir. 2012)).

We explained what the proponent of other-act evidence must do in any case—whether drug-related or otherwise—to win a favorable ruling on its admissibility:

> [I]t's not enough for the proponent of the other-act evidence simply to point to a purpose in the "permitted" list and assert that the other-act evidence is relevant to it. Rule 404(b) is not just concerned with the ultimate conclusion, but also with the chain of reasoning that supports the non-propensity purpose for admitting the evidence. In other words, the rule allows the use of other-act evidence only when its admission is supported by some propensity-free chain of reasoning.

*Id.* at *7 (citation omitted). Moreover, *Gomez* emphasized that even if the proponent of the other-act evidence can establish its relevance to a non-propensity purpose in a propensity-free way, the district court "must in every case assess whether the probative value of the other-act evidence is substantially outweighed by a risk of unfair prejudice and may exclude the evidence under Rule 403 if the risk is too great." *Id.* at *11.

Rule 403 balancing, we noted, is especially important in the context of other-act evidence, which "raises special concerns about unfair prejudice because it almost always carries some risk that the jury will draw the forbidden propensity inference."[1] *Id.* at *8. Accordingly, the trial judge's Rule 403 balancing of the probative value of the evidence against the risk of

---

[1] Rule 403 applies to all evidence and gives the court discretion to exclude otherwise relevant evidence "if its probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

unfair prejudice "does much of the heavy lifting in the admissibility analysis by excluding other-act evidence that may be slightly probative through a non-propensity theory but has a high likelihood of creating unfair prejudice by leading a jury to draw conclusions based on propensity." *Id.*

Here, the district court permitted the government to introduce the details of Chapman's 2006 conviction for heroin trafficking for the purpose of proving that he knew the substance found in the bag was heroin (based on familiarity with its packaging) and possessed the drugs with intent to distribute them. There are two problems with this theory of admissibility. First, the details of the prior heroin conviction are relevant to Chapman's knowledge and intent only through a paradigmatic inference about propensity: because Chapman sold heroin before he must have intended to do so again in this instance.

Second, even if the government had articulated a theory of relevance that does not rely on an impermissible propensity inference (and it did not), the probative value of the heroin-trafficking conviction is substantially outweighed by the risk of unfair prejudice in the specific context of this case. Chapman's defense rested entirely on his claim that he never possessed the bag *at all*. His knowledge of heroin packaging was a red herring. He never argued that he didn't recognize the substance in the bag as heroin; instead, he claimed that he did not possess the bag, period.

It's true that Chapman's intent was formally "at issue" because the drug charge in this case—possession with intent to distribute—is a specific-intent crime. *See id.* at *10–11. Even so,

as we explained in *Gomez*, the degree to which the non-propensity fact for which the other-act evidence is admitted actually is contested in the case is an important factor in the court's assessment of the probative value of the evidence under Rule 403. *Id.* at *11. Accordingly, we held that meaningful Rule 403 balancing "should take account of the extent to which the non-propensity fact for which the [other-act] evidence is offered actually is at issue in the case." *Id.* That did not happen here.

Indeed, Chapman offered to stipulate that the heroin in the bag was distribution quantity so that whoever possessed the bag intended to distribute the drugs that were found in it. Although "the prosecution is entitled to prove its case free from any defendant's option to stipulate the evidence away," *Old Chief v. United States*, 519 U.S. 172, 189 (1997), Chapman's theory of defense and his offer to stipulate that the drugs were distribution quantity significantly affected the Rule 403 balance. With intent basically uncontested, the risk of unfair prejudice took on greater significance. And although the court gave the jury a limiting instruction, the temptation to draw an impermissible propensity inference was great.

The facts of *United States v. Miller* closely track the facts of this case. There the government found drugs in a room where Miller was alleged to be staying and accused him of possessing them with intent to distribute. 673 F.3d at 694. Miller did not dispute that the drugs were packaged for distribution, but rather flatly denied that the drugs were his or that he was even staying in the room where they were found. *Id.* at 696. The district court allowed the government to introduce the details

of Miller's past drug-distribution convictions for the purpose of proving intent. We found reversible error. *Id.* at 700 ("The relevance of the prior conviction here boils down to the prohibited 'once a drug dealer, always a drug dealer' argument.").

We reach the same conclusion here. The government insists that the Rule 404(b) error did not contribute to the verdict and so was harmless. That argument contradicts the government's earlier explanation for the jury's inconsistent verdict. At sentencing Chapman's counsel reminded the court that the jury had returned a factually inconsistent verdict. The government responded by rationalizing the inconsistency by reference to the effectiveness of the Rule 404(b) evidence:

> As the Court recalls, there were — there was the testimony of four law enforcement officers. However, on the gun count, that was uncorroborated by other evidence. However, on the drug count, there was some additional evidence, namely, there was 404(b) evidence, which the jury was allowed to consider for certain purposes, and that evidence went to the drug charge. And there was also the testimony of Mr. Chapman himself and his prior drug dealing.

> So it's the Government's position that while the jury found that it met its burden of proof on the drug charge, it obviously did not find that the Government had met its burden on the gun charges.

We think the government's earlier position is the correct one. The prosecution's evidence was essentially the same across the drug and gun charges, with the notable exception of the erroneously admitted other-act evidence, which had a bearing on the count on which the jury convicted—the drug charge—but not on the gun counts on which Chapman was acquitted. It's hard to imagine a better indicator that the Rule 404(b) error swayed the jurors. The test for harmless error in this context is "whether, in the mind of the average juror, the prosecution's case would have been significantly less persuasive had the improper evidence been excluded." *Gomez*, 2014 WL 4058963, at *15 (quoting *United States v. Vargas*, 689 F.3d 867, 875 (7th Cir. 2012)). The jury's factually inconsistent verdict is strong evidence that the government's case would have been significantly less persuasive without the other-act evidence.

Even aside from the inconsistent verdict, the remaining evidence was not so overwhelming that we can say with confidence that the Rule 404(b) error was harmless. The officers initially observed Chapman from a distance through a dense fog, which they professed not to recall, casting some doubt on their testimony. Chapman's flight from the police is suggestive of guilt but far from conclusive, especially in light of Chapman's criminal history and the fact that he had marijuana in his pocket. Chapman and Collier both testified that he was not carrying a bag either before or after they entered the abandoned house. The jury likely discounted their testimony based on their admitted history of drug dealing. On the other hand, discrepancies and gaps in the evidence undermined the officers' account: (1) Chapman's fingerprints were not found

on any of the contraband, and someone else's fingerprints were on the drug packaging; (2) Officer McHale's account of entering the gangway was contradicted by photographic evidence suggesting that he could not physically have done so; and (3) neither Collier nor the unidentified woman who was in the abandoned house are mentioned in the police reports.

In short, here, as in *Miller*, the government's case would have been significantly less convincing if the improperly admitted other-act evidence had been excluded. The prosecutor seemed to concede as much in struggling to explain the inconsistent verdict at sentencing. The Rule 404(b) error was not harmless.

## B. The Exclusion of Chapman's Rehabilitation Testimony

The district court permitted the government to introduce Chapman's six prior felony convictions to impeach his credibility as a witness. Chapman sought to rehabilitate himself by explaining that he had pleaded guilty in his earlier cases because he in fact was guilty and wanted to take responsibility for his actions. The point of this testimony was to set up an argument that despite his felonious history, Chapman is not necessarily a dishonest person. Or so his counsel wanted to argue. The government objected, and the judge sustained the objection, precluding this line of inquiry.

Chapman argues that this was error, and we agree. As an initial matter, the judge seems to have misunderstood the point of this evidence. Chapman's argument was that he had pleaded guilty to past charges to take responsibility for his

actions and that his guilty pleas suggested that even though he has a criminal record, his credibility should not be discounted, or at least not discounted as much as it otherwise would be without this evidence. In contrast the judge thought that Chapman wanted to argue that because he had not contested his earlier cases but was contesting this one, he must be innocent. There is an important difference here: Chapman's *actual* argument was directed at his credibility as a witness; the argument the judge *thought* he was making was directed at guilt or innocence.

Beyond this misunderstanding, the record does not clearly reveal the basis for the judge's ruling. At a break in the testimony, Chapman's counsel asked the judge to clarify her decision to disallow the proposed rehabilitation testimony. At this point in the transcript, the judge seems to rely on Rule 609, which governs the admission of criminal convictions for impeachment purposes. That rule provides, in pertinent part:

> **(a)** … The following rules apply to attacking a witness's character for truthfulness by evidence of a criminal conviction:
>
> > **(1)** for a crime that, in the convicting jurisdiction, was punishable by death or by imprisonment for more than one year, the evidence: …
> >
> > > **(B)** must be admitted in a criminal case in which the witness is a defendant, if the probative value of the evidence outweighs its prejudicial effect to that defendant … .

FED. R. EVID. 609(a). In other words, felony convictions are presumptively admissible as evidence of untruthfulness if the probative value of this evidence is not outweighed by its prejudicial effect.[2]

But nothing in Rule 609 says that this method of impeachment is irrebuttable. To the contrary, the rules of evidence specifically allow rehabilitation by introduction of other evidence of truthfulness. Rule 608 provides that character and reputation evidence and in some cases specific instances of conduct may be admitted to support a witness's truthfulness if his credibility has been attacked.[3] So to the extent that the

---

[2] The rule provides that certain prior felonies are presumptively admissible to impeach a testifying defendant *unless* the court finds that "the probative value of the evidence outweighs its prejudicial effect to that defendant." FED. R. EVID. 609(a)(1)(B). This is a higher standard than Rule 403, which more generally gives the court discretion to exclude otherwise relevant evidence if its probative value is *substantially* outweighed by its prejudicial effect. *See* FED. R. EVID. 403. The district court did not expressly weigh the probative value of the convictions against their prejudicial effect as required by Rule 609, but Chapman does not challenge their admission, so we need not address the issue further.

[3] Although Rule 608(b) refers to inquiries into specific instances of conduct "on cross-examination" once a witness's truthfulness has been challenged, counsel can inquire into specific instances of the witness's truthful conduct to rehabilitate the witness on redirect examination. 4 MICHAEL H. GRAHAM, HANDBOOK OF FEDERAL EVIDENCE § 608:4 n.12 (7th ed. 2012) ("If character for truthfulness or untruthfulness surfaces for the first time on cross-examination, redirect is treated as equivalent to cross-examination for the purpose of permitting use of specific instances of conduct under Rule 608(b)."); *cf. Gov't of V.I. v. Roldan*, 612 F.2d 775, 778 n.2 (3d Cir. 1979)

(continued...)

judge was under the impression that Rule 609 or any other rule categorically precluded Chapman's proffered rehabilitation testimony, the ruling was based on an error of law and necessarily was an abuse of discretion. *See United States v. Smith*, 674 F.3d 722, 728 (7th Cir. 2012) ("The district court abuses its discretion when it makes an error of law … ." (quoting *United States v. Freeman*, 650 F.3d 673, 678 (7th Cir. 2011))).

The record reflects no other basis for excluding this testimony. Neither the prosecutor nor the judge relied on Rule 403, for instance, and nothing in the discussion among counsel and the court suggests that the judge was in effect balancing the probative value of the rehabilitation evidence against the danger of unfair prejudice, confusion of the issues, or any other permitted basis for excluding otherwise relevant evidence. Accordingly, it was error to exclude Chapman's proposed rehabilitation testimony.

The remaining question is whether the error was harmless. We have already held that the Rule 404(b) error requires a new trial, so the harmlessness question on this additional error is superfluous. In any event, the parties have not addressed whether the exclusion of Chapman's rehabilitation testimony

---

[3] (…continued)

(upholding admission of specific instances of conduct to demonstrate character on redirect examination, explaining: "Character evidence was introduced for the first time on cross-examination. For the purpose of rebuttal of this evidence, therefore, the Government's redirect examination was the functional equivalent of the 'cross-examination' referred to in rule 405(a).").

was prejudicial, and because the government bears the burden of showing harmlessness, *United States v. Vasquez*, 635 F.3d 889, 899 (7th Cir. 2011), Chapman wins by default.

## C. The Exclusion of Derrick Lewis's Testimony

Chapman's last argument is that the district court's refusal to compel Derrick Lewis's testimony deprived him of his Sixth Amendment right to compulsory process. *See* U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right … to have compulsory process for obtaining witnesses in his favor … ."). Chapman's argument pits his Sixth Amendment right to compulsory process against Lewis's Fifth Amendment right against self-incrimination.

The conventional response to this clash of rights is that the witness's Fifth Amendment privilege trumps the defendant's Sixth Amendment right. *See United States v. Mabrook*, 301 F.3d 503, 506 (7th Cir. 2002). The analytical framework is this:

> When a potential witness indicates that he will likely invoke his privilege against self-incrimination, the district court should ensure that the witness cannot possibly incriminate himself. If a witness's testimony may make him vulnerable to prosecution, the trial court may allow him to invoke his privilege and refuse to testify.

*Id*.

Thus, the witness's testimony need only "make [the witness] vulnerable to prosecution." *Id.* This means that the

Fifth Amendment may be invoked "where the witness has reasonable cause to apprehend danger from a direct answer" to the questions that may be put to him during his compelled testimony.[4] *United States v. Longstreet*, 567 F.3d 911, 922 (7th Cir. 2009) (internal quotation marks omitted). Further, because "[a] testifying witness cannot deprive the opposing party of the right of cross-examination," *id*. at 923 (internal quotation marks omitted), the witness's Fifth Amendment privilege must be honored even if the danger of self-incrimination arises from cross-examination rather than direct examination. Although we normally review claimed constitutional errors de novo, this particular question is subject to more deferential review for abuse of discretion. *See Mabrook*, 301 F.3d at 506.

---

[4] Although the text of the Fifth Amendment provides that "[n]o person … shall be compelled *in any criminal case to be a witness against himself*," U.S.CONST. amend. V (emphasis added), established doctrine assumes that a person may invoke his Fifth Amendment privilege against self-incrimination in a variety of settings beyond his own criminal trial. As the Supreme Court has explained:

> The Amendment not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers may incriminate him in future criminal proceedings.

*Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973). Where, as here, a witness's Fifth Amendment right against self-incrimination conflicts with the defendant's Sixth Amendment right to compel witnesses in his favor, this broad understanding of the Fifth Amendment privilege effectively favors *potential* defendants over *actual* defendants.

Prosecutors can resolve the tension between Fifth and Sixth Amendment rights by granting testimonial immunity under 18 U.S.C. § 6002. Once immunity is granted, the witness may be compelled to testify, but his testimony cannot be used against him in his own criminal trial. 18 U.S.C. § 6002. This mechanism rarely benefits defendants, however, because

> [a]s a matter of [Department of Justice] policy, 18 U.S.C. § 6002 will not be used to compel the production of testimony or other information *on behalf of a defendant* except in extraordinary circumstances where the defendant plainly would be deprived of a fair trial without such testimony or other information. This policy is not intended to preclude compelling a defense witness to testify if the prosecutor believes that to do so *is necessary to a successful prosecution*.

UNITED STATES ATTORNEYS' MANUAL ch. 9-23.214, *available at* http://www.justice.gov/usao/eousa/foia_reading_room/usam/ title9/23mcrm.htm (last visited Aug. 26, 2014) (emphases added). In other words, it's not enough that a defendant *might* be deprived of a fair trial without the desired testimony; the government's policy is to grant immunity only where the failure to do so would *plainly* deprive the defendant of a fair trial.

Some courts have assumed the power to grant immunity themselves. *See, e.g.*, *Gov't of V.I. v. Smith*, 615 F.2d 964, 974 (3d Cir. 1980) (requiring defense-witness immunity "when it is found that a potential defense witness can offer testimony which is clearly exculpatory and essential to the defense case

and when the government has no strong interest in withholding use immunity"). We have not. *See United States v. Herrera-Medina*, 853 F.2d 564, 568 (7th Cir. 1988); *United States v. Hooks*, 848 F.2d 785, 802 (7th Cir. 1988). Nor have we assumed the authority to order a prosecutor to grant a witness immunity. *See United States v. Burke*, 425 F.3d 400, 411 (7th Cir. 2005).

Instead, we have held that a prosecutor's refusal to do so may amount to a denial of due process, but only in very limited circumstances:

> [T]he prosecutor's power to seek or to refuse to seek immunity is limited by the constitutional right to due process of the law. Accordingly, this appellate court will not review a prosecutor's immunization decisions in the absence of substantial evidence showing that the prosecutor's actions amounted to a clear abuse of discretion violating the due process clause. The prosecutor has abused his discretion when he intends to use his authority to distort the judicial fact-finding process.

*Hooks*, 848 F.2d at 799 (internal quotation marks and citations omitted); *see also Burke*, 425 F.3d at 411 ("A defendant's due-process rights are violated when the prosecutor abuses his authority to immunize witnesses with the intention of distorting the fact-finding process."); *Herrera-Medina*, 853 F.2d at 568 (explaining that although a court cannot order the government to immunize a defense witness, a court can dismiss an indictment when the prosecutor's refusal to grant immunity amounts to a denial of due process). As far as we can tell, this

court has never found that the failure to grant immunity to a defense witness deprived the defendant of due process. *See Herrera-Medina*, 853 F.2d at 568 ("[W]e know of no case that has actually been dismissed on this ground."). Chapman has not argued that the government abused its authority and refused to immunize Lewis to distort the fact-finding process.

We agree with the district court that Lewis's invocation of the privilege against self-incrimination had a good-faith basis. If the judge had compelled Lewis to testify, the prosecutor almost certainly would have asked about his use of the nickname "D.C." and the precise nature of his relationship with Collier, who had already testified that she was at the scene talking to Lewis about dealing drugs for him. More generally, the prosecutor likely would have cross-examined him about his history of dealing drugs. So even if Chapman's direct examination was narrowly limited, the government's probable cross-examination of Lewis could "make him vulnerable to prosecution." *Mabrook*, 301 F.3d at 506. The district court properly accepted Lewis's invocation of the Fifth Amendment and refused to compel him to testify.

We caution, however, that this is not the end of the story. Whether a witness may invoke the privilege against self-incrimination depends on the circumstances that the witness faces, and Lewis's circumstances may have changed since the time of the first trial. On retrial the district court may need to assess Lewis's invocation of the Fifth Amendment anew.

### III. Conclusion

For the foregoing reasons, we VACATE Chapman's conviction and REMAND for a new trial.[5]

---

[5] Chapman also challenged his sentence, arguing that the district court failed to adequately address his principal arguments in mitigation. Our decision to vacate and remand for a new trial moots the challenge to the sentence. Also moot is Chapman's Motion for Disclosure of certain emails between the district judge and a deputy marshal or his wife. On July 21, 2014, the judge issued an order recusing herself from further participation in this case, and in any event, under Circuit Rule 36, a case must be reassigned whenever there is a remand for retrial.