In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 16-3111

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DIANA J. GUMILA,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14 cr 411 — **Charles P. Kocoras**, *Judge.*

———————————

ARGUED APRIL 7, 2017 — DECIDED JANUARY 16, 2018

———————————

Before POSNER,* RIPPLE, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Diana Gumila ran a home-healthcare
company that defrauded the federal government of several
million dollars. She was convicted of multiple counts of
healthcare fraud and making false statements in connection

———————————

* Circuit Judge Posner retired on September 2, 2017, and did not partici-
pate in the decision of this case, which is being resolved by a quorum of
the panel under 28 U.S.C. § 46(d).

with a healthcare matter. The district judge imposed a below-guidelines prison sentence of 72 months followed by 24 months of supervised release.

Gumila appeals, raising several challenges to her sentence. She first argues that the judge miscalculated the financial loss attributable to her offenses. She also contends that the 72-month prison term is substantively unreasonable. Finally, she claims that the judge did not adequately explain the term and conditions of supervised release. The first two arguments are meritless. The third is waived. We affirm.

## I. Background

Diana Gumila was head of clinical operations for Suburban Home Physicians, LLC, which did business under the name "Doctor at Home." The company employed doctors and other medical personnel to provide home medical care to the elderly in and around Chicago. Gumila was indicted on 21 counts of healthcare fraud in violation of 18 U.S.C. § 1347 and three counts of making a false statement in a healthcare matter in violation of 18 U.S.C. § 1035. The indictment alleged that Doctor at Home (1) overbilled Medicare for medical home visits; (2) billed Medicare for unwarranted skilled-nursing services; and (3) billed Medicare for care-plan oversight services that were never provided.

At trial the government introduced testimony from more than 20 witnesses and a trove of documentary evidence establishing that Gumila played a central role in Doctor at Home's scheme to defraud the government. The evidence showed that she regularly overruled physicians who wanted to discharge patients from their care. She instructed nonphy-

sician employees to bill medical services at unjustifiably high rates (a practice known as "upcoding"). She instructed employees to claim that patients were homebound even when they weren't. And she instructed employees to process orders authorizing skilled-nursing services even if the attending doctor did not believe the patient qualified for that service and even when no doctor had ever examined the patient. A jury found her guilty on all counts.

Before the sentencing hearing, the government proposed figures for three categories of financial loss suffered by Medicare: (1) approximately $2.375 million for unnecessary and upcoded home visits; (2) at least $9.45 million for skilled-nursing services that did not meet Medicare's requirements and were unnecessary; and (3) $3.779 million in claims for care-plan oversight services that did not qualify for payment or were never performed.

In the presentence report ("PSR"), the probation officer substantiated those figures for the three categories of loss and estimated the total financial loss stemming from Gumila's unlawful conduct to be $15.6 million. The corresponding guidelines range was 151 to 188 months in prison. The probation officer recommended a below-guidelines sentence of 84 months in prison and a 24-month term of supervised release. The PSR also recommended 18 specific conditions of supervision.

Gumila filed written objections to the PSR, challenging the loss calculation and arguing that the loss should be limited to Medicare payments for the eight patients specifically mentioned in the indictment—for a total loss of only $14,449. She argued for a prison sentence of 12 to 18 months. She did not object to the recommended term or conditions of

supervised release. The government recommended a below-guidelines sentence of 120 months in prison, a 24-month term of supervised release, and $15.6 million in restitution.

At sentencing the judge concluded that the evidence established an "overwhelming and massive scheme" to defraud the Medicare program. He rejected Gumila's argument that the government was required to present specific evidence to prove the fraudulent nature of each individual transaction contributing to the total financial loss. He also determined that the PSR's loss estimate of $15.6 million was reasonable. The judge imposed a sentence of 72 months in prison (less than half the low end of the guidelines range) and 24 months of supervised release. He also imposed the 18 conditions of supervision recommended by the PSR and ordered Gumila to pay $15.6 million in restitution.

## II. Discussion

On appeal Gumila raises three arguments: (1) the district judge erred in calculating the financial loss attributable to her; (2) the 72-month prison term is substantively unreasonable; and (3) the judge committed procedural error by failing to explain the term and conditions of supervised release by reference to the relevant factors listed in 18 U.S.C. § 3553(a).

### A. Loss Calculation

We review the judge's loss calculation deferentially and will reverse only if we find clear error. *United States v. Littrice*, 666 F.3d 1053, 1060 (7th Cir. 2012). Gumila must show that the judge's calculation "was not only inaccurate but outside the realm of permissible computations." *Id.* (quoting *United States v. Al-Shahin*, 474 F.3d 941, 950 (7th Cir. 2007)). At sentencing the government bears the burden of

proving the loss amount by a preponderance of the evidence, but a reasonable estimate will suffice. *United States v. Schroeder*, 536 F.3d 746, 752 (7th Cir. 2008).

The judge determined that the government's method for calculating loss was both "supported by the evidence and … quite compelling." He noted that Doctor at Home employed a routine set of procedures in its scheme to defraud the government, most of which were illegal in themselves, and that Gumila personally orchestrated those procedures. Gumila attacks each category of loss individually, but she also makes a general argument that the loss calculation should be limited to the illicit Medicare payments associated with the eight patients listed in the indictment.

The generalized argument requires little comment. The judge's task was to estimate total loss, and to do so he was permitted to approximate by scaling up the evidence "to reflect the scope of the loss involved." *United States v. Natour*, 700 F.3d 962, 978 (7th Cir. 2012). The eight specific patients listed in the indictment were merely representative of the thousands of patients for whom Doctor at Home submitted fraudulent claims that were subsequently paid by the government. The judge was not required to limit the loss calculation solely to those eight patients when evidence established a far more sweeping overall fraudulent scheme. *See United States v. Sutton*, 582 F.3d 781, 784 (7th Cir. 2009).

Gumila's specific challenges to the separate categories of loss fare no better. We take each one in turn.

### 1. *Losses Attributable to Home Visits*

Medicare will pay for home visits only if there is a documented medical necessity for that type of care in lieu of an

office or outpatient visit. The government presented evidence at trial that a vast number of the home visits performed by Doctor at Home never qualified for Medicare payment in the first place.[1] Doctor at Home also regularly and fraudulently upcoded its home visits.

To submit a home-visit invoice to Medicare, Doctor at Home first had to code the visit. Home visits receive one of four different billing codes based on the severity of the medical problem addressed during the visit, the complexity of the medical decision reached during the visit, the type of care provided during the visit, and the length of time for the visit. The more complex or demanding the visit, the larger the bill. According to Medicare regulations, high-coded visits are justified when the medical examination is "detailed" or "comprehensive," the medical decision-making is moderately to highly complex, and the problems presented by the patient are moderately to highly severe. Additionally, the normal period of time spent with a patient for a high-coded visit should be about 40–60 minutes. On the other hand, visits warrant one of two lower billing codes when the examination is "problem-focused," the medical decision-making is straightforward and not complex, the problem

---

[1] For example, a doctor employed by Doctor at Home testified that 60% of her home visits did not qualify for Medicare reimbursement. The company's medical director stated that "with each passing day, Doctor [a]t Home is committing fraud by seeing patients who can drive, go to a [primary care physician,] or walk out of the house unassisted." A number of patients testified that they left their home regularly even though Doctor at Home claimed them as homebound, and emails established that patients attempted unsuccessfully to remove themselves from Doctor at Home's rolls of homebound patients.

presented is low to moderately severe, and the amount of time spent with the patient is about 15–25 minutes.

Doctor at Home billed nearly every home visit at the two highest codes. But several employees testified at trial that the vast majority of these visits, which were nearly all scheduled to occur regularly on a monthly basis, were simple check-ups, not sick visits, and thus did not qualify for billing at those rates. A memo drafted at Gumila's command coached Doctor at Home employees to cajole patients into maintaining their regular schedule of home visits whenever they tried to cancel them. Witnesses also testified that the home visits were routine in nature and that if the visits qualified for Medicare payment at all, they should have been coded at the lowest level. And emails showed Gumila knew that at least one doctor routinely paid only brief visits to the patients, sometimes not even speaking to them during the visit, and performed no examination beyond listening to their hearts and lungs. Nonetheless, nearly all of that doctor's visits were billed at the highest code. Other emails showed that Gumila instructed employees to use *only* the two highest codes when billing the visits.

To estimate the losses attributed to these upcoded home visits, the judge determined the amount that Medicare would have paid had the visits been billed at a lower code rate instead of at the top two rates. The difference totaled $2.375 million. The judge's calculation generously assumed that each home visit qualified for *some* level of reimbursement from Medicare, even though the evidence at trial established that a large number of these visits did not qualify *at all*. Thus, the calculation for this category was more conservative than it might have been. *See United States v.*

*Mikos*, 539 F.3d 706, 714 (7th Cir. 2008) (holding that the loss should not be discounted for value of services rendered because the services did not qualify for Medicare payment in the first place). We find no error in this approach.

### 2. *Losses Attributed to Skilled-Nursing Services*

Medicare reimburses for skilled-nursing services only if the patient is homebound and requires such services. A physician must sign an order requesting the service. Evidence at trial showed that Doctor at Home trained nonphysician employees to alter patient charts to make it appear that the attending physician qualified the patient as homebound and to delete information indicating that the patient didn't need nursing services. One former employee testified that a Doctor at Home physician would sign a stack of orders for skilled-nursing services without examining the patients or even reading the patients' files. Gumila also regularly overruled doctors who tried to discharge non-homebound patients from nursing services. Finally, Gumila herself authorized orders for nursing services for patients whom no Doctor at Home physician had ever seen.

To estimate the loss attributable to the fraudulently billed skilled-nursing services, the government focused on Drs. Pauwaa and Newman, both of whom worked with Doctor at Home during the relevant time period. Medicare paid approximately $16.6 million for nursing services ordered by Dr. Pauwaa and approximately $8.2 million for nursing services ordered by Dr. Newman. Based on a review of these payments along with other claims data showing that many of those patients who received nursing services didn't qualify as homebound, the judge estimated that 40% of the payments for services ordered by Dr. Newman and 43% of

the payments for services ordered by Dr. Pauwaa were directed to patients who did not qualify as homebound. This fraudulent billing totaled about $9.35 million.[2]

Though the judge limited his calculation of skilled-nursing services to those requested by Drs. Pauwaa and Newman, evidence established that many other employees also fraudulently claimed patients as being homebound. In other words, the judge's estimate of loss for this category of fraudulent billing was again on the conservative side. Gumila has not identified any clear error in the judge's approach to estimating losses attributable to skilled-nursing overbilling.

### 3. *Losses Attributed to Care-Plan Oversight Services*

Care-plan oversight services include physician supervision of patients requiring complex or multidisciplinary care and ongoing physician involvement. Medicare pays for oversight services that take 30 minutes or longer to perform so long as certain requirements are met, including the requirement that the patient's problems are complex enough to require a doctor's ongoing involvement in the patient's care plan. Evidence at trial established that Doctor at Home employees in Illinois and the Philippines fabricated forms claiming Medicare reimbursement for nonexistent oversight services. Witnesses testified that employees scoured patient files to find anything that might be passed off as a potentially covered activity on the Medicare oversight-services form and attributed time to that service. Moreover, these employ-

---

[2] Dr. Newman also confirmed the amount attributed to him in his own plea agreement.

ees billed Medicare without ever confirming that a doctor had spent time performing oversight services for that patient.

The judge estimated that Medicare paid $3.779 million to Doctor at Home for these fraudulent care-plan oversight services. The judge determined that *all* the Medicare invoices in this category were fraudulent because there was *no* evidence that any oversight services qualifying for Medicare payment were ever performed. Gumila points out that at least some employees filled out care-plan oversight billing forms by referring to "services that had been documented as performed in the charts." But the notation alone does not establish that oversight services were in fact performed, were medically justified, or were accurately calculated according to the amount of time actually spent on the patient as required. Indeed, Gumila acknowledges that these employees did nothing to verify what services (if any) had been performed by the attending physicians. The judge did not clearly err in determining that none of the payments for care-plan oversight services were warranted.

Gumila's final challenge is that the judge's overall calculation did not take into account the fair market value of the services rendered. She argues that the patients received *some* value from the doctors' and nurses' visits, which must be reflected in any discounting of Medicare payments received for those services. As we've noted, however, the judge *did* account for the fair value of services actually rendered, but only when the record arguably supported it. For medical home visits, for example, the judge calculated the loss by taking the difference between the amount that Doctor at Home overbilled Medicare and the billing rates that more

accurately reflected the types of home visits that Doctor at Home actually performed. For home nursing services, the judge relied on evidence from two doctors that approximately 40% of the services ordered didn't qualify for Medicare at all. But for the care-plan oversight services, Gumila was unable to establish that any of the services had even been performed, let alone that they qualified for Medicare reimbursement.

## B. Substantive Unreasonableness

Gumila next argues that her 72-month prison term is substantively unreasonable. This is a steep uphill climb. Our review is deferential, for abuse of discretion only. *United States v. Annoreno*, 713 F.3d 352, 356–57 (7th Cir. 2013). A sentence within a properly calculated guidelines range is presumptively reasonable, *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005), but more to the point here, we have "never deemed a below-range sentence to be unreasonably high," *United States v. Wallace*, 531 F.3d 504, 507 (7th Cir. 2008). Gumila's 72-month sentence is less than half the low end of the guidelines range of 151 to 188 months. She has given us no good reason to overturn her sentence as unreasonably long.

## C. Supervised Release Procedural Error

The judge imposed a 24-month term of supervised release and 18 conditions of supervision as recommended in the PSR. Gumila argues that the judge committed procedural error by failing to adequately explain the length of the term and the conditions of supervised release.

This argument is waived. The PSR gave Gumila written notice of the proposed term and conditions of supervised

release (and the justifications for each condition) well in advance of the sentencing hearing. The judge directed her to respond in writing with any objections to the report. She did so, but her memorandum challenged only the loss calculation and the PSR's suggested evaluation of the § 3553(a) factors in relation to the recommended prison sentence. She did not object to any of the supervised-release conditions or the term of supervised release.

The sentencing hearing is the "main event," and when the court gives advance notice of the proposed term and conditions of supervised release, the parties can "prepare and identify issues they wish to address." *United States v. Lewis*, 823 F.3d 1075, 1083 (7th Cir. 2016). Advance notice permits the defendant to "present an informed response" at the hearing. *United States v. Kappes*, 782 F.3d 828, 843 (7th Cir. 2015). Here the PSR gave Gumila all the notice she needed to make an informed objection to the proposed term and conditions of supervised release. She did not do so. We've held that a defendant's "failure to object in th[ese] circumstances can amount to waiver." *United States v. Gabriel*, 831 F.3d 811, 814 (7th Cir. 2016) (citing *Lewis*, 823 F.3d at 1083–84); *see also United States v. Bloch*, 825 F.3d 862, 873 (7th Cir. 2016) (stating waiver exists when there was no "lack of notice or surprise at the conditions the district court planned to impose").

Gumila's written response to the PSR challenged several factors that would bear on the prison term and restitution (e.g., the loss calculation), but she lodged no objection to the proposed term or conditions of supervised release. That's a waiver, as we've recently held in a materially identical case.

*See United States v. Ranjel*, 872 F.3d 815, 821–22 (7th Cir. 2017).

AFFIRMED.