In the

# United States Court of Appeals

## For the Seventh Circuit

───────────────

No. 21-3270

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANGELITA NEWTON,

*Defendant-Appellant.*

───────────────

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:17-cr-00455-3 — **Virginia M. Kendall**, *Judge.*

───────────────

ARGUED SEPTEMBER 12, 2022 — DECIDED AUGUST 7, 2023

───────────────

Before EASTERBROOK, KIRSCH, and JACKSON-AKIWUMI,
*Circuit Judges.*

JACKSON-AKIWUMI, *Circuit Judge.* Angelita Newton chal-
lenges the conviction and sentence she received for her in-
volvement in a scheme to defraud Medicare. First, she argues
that she was denied a fair trial because she could not question
a witness who invoked the Fifth Amendment's protections
against self-incrimination. But we reject the argument and af-
firm Newton's conviction because the district court rightly

concluded that the witness's invocation of the Fifth Amendment was proper and the government's refusal to issue immunity to that witness did not distort the fact-finding process. Second, Newton argues that her sentence is procedurally flawed and substantively unreasonable. Because we agree that the district court's calculation of Medicare's loss attributable to Newton was unreasonable, we vacate Newton's sentence and remand for resentencing.

## I

From 2011 to 2017, Care Specialists, Inc., owned by husband-and-wife team Ferdinand and Ma Luisa Echavia, operated as a provider of health care to homebound beneficiaries of Medicare.[1] At least part of its operation, however, was a ruse to collect Medicare reimbursements fraudulently. Care Specialists would submit Medicare claims for health services, including skilled nursing services, provided to patients that the company represented as confined to their homes. But many of these patients did not qualify for Medicare reimbursement because they were not actually homebound or in need of skilled care. The company doctored service notes to either overcharge for services or bill for services not provided. The company also, by altering dates, resubmitted claims that had been rejected by Medicare because the patient was already admitted to an in-patient facility on the date Care Specialists purportedly provided care.

Ferdinand, in addition to being the owner, provided nursing services to some of Care Specialists' patients. But in 2014,

---

[1] Ferdinand Echavia owned the company from its inception until he was excluded from participating in Medicare in 2014, at which point he transferred ownership to Ma Luisa.

he was excluded from participating in Medicare due to a prior conviction for providing kickbacks to patients at another home health agency. Ferdinand brought this practice with him to Care Specialists as a way to recruit and retain patients. And, despite his exclusion, Ferdinand continued to provide patients with nursing services for which the company sought reimbursement. He concealed his involvement in patient care from Medicare by accompanying one of the other nurses, Reginald Onate, as Onate visited patients.

Newton got caught up in the scheme. She was hired as a quality assurance specialist and Ferdinand's personal secretary. In her role as a quality assurance specialist, Newton should have been limited to reviewing nurses' treatment notes for completeness before the company submitted a Medicare claim for billing. If notes were incomplete, quality assurance specialists like Newton were supposed to inform the treating nurse who would fix the omission. But employees testified that Newton instead would personally draft Ferdinand's notes submitted in support of claims. Ferdinand would leave scrap paper noting each patient's vital signs. Newton would then fill in the proverbial blanks by writing a "full head-to-toe assessment" including descriptions of skilled nursing interventions. Newton would also fudge the dates on treatment notes to ensure that Medicare would accept the associated reimbursement claim. Despite playing this role in the fraud, Newton earned an average annual salary of $54,080, which did not additionally compensate her for her involvement in the conspiracy.

The conspiracy came crumbling down when a former employee of Care Specialists, Norma Bolender, filed a whistleblower letter describing the scheme that Care Specialists had

concocted. Bolender met with federal investigators multiple times. At those meetings, Bolender directly implicated Newton as a key figure in the conspiracy. A grand jury issued indictments charging the Echavias, Newton, and Onate for their roles in the Medicare fraud. The Echavias and Onate agreed to plead guilty to their involvement. Newton was the only charged defendant to proceed to trial.

The jury found Newton guilty of conspiracy to commit both health care fraud and wire fraud after hearing testimony from multiple Care Specialists employees. This did not include Bolender who avoided testifying by invoking her rights against self-incrimination under the Fifth Amendment. After the guilty verdict, Newton filed a motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure, challenging for the first time Bolender's invocation of the Fifth Amendment. Newton argued that the court wrongly accepted the invocation and the government's refusal to grant Bolender immunity violated her due process rights.

The court denied the motion, explaining that prosecutors hold significant discretion over granting or withholding immunity, and they abuse that discretion only if they withhold immunity intending to "distort the judicial fact-finding process." *United States v. Chapman*, 765 F.3d 720, 731 (7th Cir. 2014) (cleaned). The court concluded that the government did not distort the fact-finding process at Newton's trial because Bolender's testimony was just as likely, if not more likely, to inculpate Newton as it was to exculpate her. The court further concluded that Bolender's invocation of her rights under the Fifth Amendment had been proper because she potentially would have opened herself up to prosecution if she had testified.

At sentencing, the judge concluded that Newton's offense level should be enhanced 18 levels for a loss amount to Medicare of $6.3 million, which represented a 10% reduction from the roughly $7 million paid to Care Specialists by Medicare during the period of the fraud. Based on this, and other adjustments, the judge found Newton's guidelines range to be 70 to 87 months in prison. The judge then sentenced Newton to a below-guidelines term of 56 months in prison and ordered her jointly and severally liable for $6.3 million in restitution.

Newton now appeals, raising constitutional challenges to her conviction, which we turn to first, and procedural and substantive challenges to her sentence.

## II

Newton argues that her conviction violated her right to a fair trial because Bolender was permitted to invoke the Fifth Amendment, depriving Newton of exculpatory testimony. Her argument proceeds in two parts. First, Newton claims that her Fifth Amendment right to due process was violated when the government refused to immunize Bolender from prosecution. Second, Newton contends that the district court should have required Bolender to testify in any event because she was protected from prosecution by the applicable statute of limitations. Though not framed as such, we read this second challenge as an argument that the district court deprived Newton of her right to compulsory process under the Sixth Amendment. *See Chapman*, 765 F.3d at 730 (noting a witness's invocation of the Fifth Amendment creates a conflict between his right against self-incrimination and the defendant's Sixth Amendment right to compulsory process).

To set the stage, we begin by detailing Bolender's involvement at Newton's trial. The government initially planned to call Bolender to testify, but it backtracked and decided not to do so. On the eve of trial, the government informed the court and Newton that it would not call Bolender as a witness because of potential Fifth Amendment concerns. The government agreed to keep Bolender under subpoena at Newton's request.

Newton attempted to call Bolender as a witness at trial; she believed Bolender would provide exculpatory testimony. But Bolender seemed implicated in the conspiracy, so the court appointed an attorney to advise Bolender on her Fifth Amendment rights before Newton proceeded with questioning. The attorney identified a statute of limitations defense that might shield Bolender from prosecution, paving the way for Bolender to testify without fear of opening herself up to prosecution. The relevant statute of limitations was five years, and Bolender left Care Specialists in January 2015, more than five years before Newton's trial in February 2020. But, it was not until October 2015 that Bolender sent the whistle blower letter to authorities, a date that would place Bolender's conduct within the five-year statute of limitations. Bolender's attorney advised her and the court that he was not sure when, between January and October 2015, the limitations period had begun to run.

With the trial on pause, and before Bolender decided whether to invoke the Fifth Amendment, Newton's counsel complained to the court that the defense only learned for the first time at the final pretrial conference, two weeks before trial, that Bolender "may have potential Fifth Amendment issues." The court asked: "Well, did you know about [the Fifth

Amendment issues] based upon the [interview] reports?"
Newton's counsel responded:

> I don't think she has Fifth Amendment issues,
> your Honor. I just wanted to clarify the timeline.
> She was subpoenaed by the government origi-
> nally, but she is our witness. So that's how that
> whole thing went down.

Bolender ultimately invoked her rights under the Fifth
Amendment and did not testify. At no point did Newton clar-
ify that the court should reject the invocation because of
Bolender's potential statute-of-limitations defense, or that the
government should be required to offer Bolender immunity.

Before addressing Newton's arguments, we must settle
the issue of our standard of review. The government says
Newton raised her objections to Bolender's Fifth Amendment
invocation for the first time in a post-trial motion, which was
too late to avoid forfeiture. If Newton forfeited her argu-
ments, as the government claims, we must apply plain-error
review. Newton insists that she objected to Bolender's invo-
cation during trial, even if she did not use the word "objec-
tion." She says this argument and her argument that the gov-
ernment should have offered Bolender immunity were
properly preserved, so we should review the matter for an
abuse of discretion.

The government is correct that Newton did not object to
the court's acceptance of Bolender's invocation during trial.
When Newton's counsel said, "I don't think [Bolender] has
Fifth Amendment issues," Bolender had not yet invoked her
rights, and Newton did not suggest that the court should re-
ject Bolender's invocation if she made one. After Bolender

invoked the Fifth Amendment, Newton's counsel responded simply by saying, "Well, that creates difficulties." Indeed, Newton accepted Bolender's invocation and attempted to work with the government on stipulating to the admission of information in Bolender's interview reports.

As for Newton's claim that she preserved her argument that the government should have granted Bolender immunity, the record shows Newton did not remotely hint that she wanted to assert a due process argument. Nor did she suggest that the government should grant Bolender immunity. The district court had no reason at the time to think that Newton wanted to make an objection on that basis.

Newton raised these two arguments for the first time in her motion for a new trial. But issues that should have been brought at trial and are raised for the first time in a post-trial motion are forfeited. *See United States v. Reese*, 666 F.3d 1007, 1020 (7th Cir. 2012); *United States v. Wing*, 104 F.3d 986, 988–89 (7th Cir. 1997). Consequently, Newton's arguments are subject to plain-error review. *United States v. Galvan*, 44 F.4th 1008, 1011 (7th Cir. 2022). To establish plain error, Newton must show that the error is "clear or obvious," affected her "substantial rights," and "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (cleaned).

We begin with Newton's argument that her due process rights were violated when the government selectively withheld immunity from Bolender while granting immunity to other witnesses. Prosecutors have "significant discretion" to grant immunity and compel testimony when a witness invokes the Fifth Amendment's protections against self-incrimination. 18 U.S.C. § 6002, 6003(b); *United States v. Davis*,

845 F.3d 282, 291–92 (7th Cir. 2016). This discretion is subject only to the requirement that the government not selectively "immunize witnesses with the intention of distorting the fact-finding process." *Davis*, 845 F.3d at 292 (cleaned). While courts may not direct the government to grant immunity, if the government abuses its discretion to provide it, courts may vacate a conviction based on a violation of due process. *See id.*

The parties also disagree about which side of a circuit split we have come down on in regard to whether, in addition to distorting the fact-finding process, the prosecutor must have subjectively intended to cause such manipulation. We need not concern ourselves with this question, however, because Newton cannot clear the initial threshold. The district court, in denying Newton's post-trial motion, reasonably concluded that she could not show that the fact-finding process was distorted.

When Bolender initially alerted the authorities to the fraud at Care Specialists, she specifically highlighted Newton's role in the conspiracy, explaining that Newton drafted fraudulent records for Ferdinand. The district court rightly acknowledged that Bolender repeatedly implicated Newton during subsequent interviews:

> For example, [Bolender] told investigators that she "witnessed Newton completing blank forms 'all the time' for [Ferdinand's] patients, and she also changed dates on visit notes" pursuant to orders from the Echavias. [Doc. 244-4 at 2; Doc. 244-7 at 3] (Bolender on record stating "[t]he visit notes were controlled by [Newton] and [Mrs. Echavia].");  [Doc. 244-10 at 5–6] (Bolender explaining to investigators that

> Newton completed blank patient visit forms
> "all the time" under the direction of the Ec-
> havias).

*United States v. Newton*, No. 17 CR 455-3, 2021 WL 5564876, at *9 (N.D. Ill. Nov. 29, 2021). Further, the court emphasized that, in a February 2017 interview, Bolender explained that, although Newton misrepresented dates and times under the Echavias' direction at first, she later demonstrated an aptitude for the work, understanding the marching orders "based on years of experience working in the home health field."

Newton pushes back, painting Bolender's interviews in a different light. Newton points out that during her last interview with authorities, Bolender repeatedly stated that Newton was merely a secretary and she was not aware of Newton's education or experience. Bolender also suggested that she herself did not realize Care Specialists was engaged in fraud until years after she started working there. According to Newton, if Bolender did not initially recognize that fraud was occurring, a jury could find that the relatively less experienced Newton could not have known about it either. But it was not unreasonable for the district court to reject this notion because even if Bolender testified that *she* was not subjectively aware of Care Specialists' fraud, that testimony would have no bearing on *Newton's* knowledge. Further, even if Newton was only ever a secretary, that fact does not mean that she could not have understood the fraud that was occurring and of which she was a part. She worked directly under the owners that concocted the fraud, presumably making Newton privy to insider information that Bolender may have lacked.

Newton maintains that the jury could have found for her because Bolender, in response to an interview question about

whether she believed Newton had intentionally acted illegally or improperly, said that "people were just trying to follow orders from their boss." But to the extent that Bolender had a personal opinion about Newton's subjective knowledge, that opinion would have been beside the point. *See United States v. Wantuch*, 525 F.3d 505, 514 (7th Cir. 2008) (holding that lay witness's opinion about whether defendant knew his actions were illegal was inadmissible under Rule 701 of the Federal Rules of Evidence).

Further, Bolender's final interview is only exonerating if we view it in isolation. Although Bolender said that Newton worked off of Ferdinand's "scratch" notes, Bolender had previously explained that these scratch notes contained very little information about patient visits. Nothing contradicted other evidence showing that Newton filled in the gaps by making up additional information. Bolender also did not walk back her previous assertion that Newton would frequently alter or fabricate the dates and times on treatment notes. And even during the final interview, Bolender said that she personally witnessed Newton writing notes that Newton was not supposed to write. Nothing about all of this is clearly exonerating. The district court therefore did not plainly err when it concluded that the absence of Bolender's testimony at trial did not distort the fact-finding process.

We now turn to Newton's related argument that the district court erred by accepting Bolender's invocation of her Fifth Amendment rights. According to Newton, the court should have inquired more about Bolender's statute of limitations defense after her counsel identified it as a possibility.

When a subpoenaed witness invokes the Fifth Amendment, the privilege against self-incrimination generally

trumps a defendant's Sixth Amendment right to compulsory process. *Chapman*, 765 F.3d at 730. A district court should reject a witness's Fifth Amendment invocation only if "the witness cannot possibly incriminate [herself]." *Id.* (quoting *United States v. Mabrook*, 301 F.3d 503, 506 (7th Cir. 2002)). Otherwise, the Fifth Amendment may be invoked so long as the witness has "reasonable cause" to fear prosecution if she gives a direct answer to the questions that may be posed during examination. *Id.*

It is neither clear nor obvious that Bolender lacked a reasonable fear of prosecution. *See United States v. Harper*, 662 F.3d 958, 961 (7th Cir. 2011) (error is plain if "clear" or "obvious" to the district court). Bolender's lawyer informed the court that she might be safe from prosecution, but he could not be sure as the risk would depend on the date Bolender withdrew from the conspiracy. Although Bolender left Care Specialists in January 2015, leaving a company engaged in criminal conspiracy is not necessarily enough on its own to constitute withdrawal from the conspiracy. *United States v. Nagelvoort*, 856 F.3d 1117, 1128–29 (7th Cir. 2017). Rather, Bolender needed to take some affirmative act to disavow the criminal objective. *Id.* at 1129 (citing *United States v. Morales*, 655 F.3d 608, 640 (7th Cir. 2011)). Bolender's whistle-blower letter in October 2015 would be sufficient—but that was still within the five-year statute of limitations at the time of Newton's trial. In her appellate brief, Newton even acknowledges that the issue is "complicated." Given all the uncertainty, we cannot conclude that it was clear or obvious that Bolender was protected from prosecution and therefore the district court was required to reject her invocation of the Fifth Amendment as improper. The court was not required to do so under these circumstances.

### III

We now consider Newton's challenges to her sentence. She challenges both the procedure used in calculating the sentence and its substantive reasonableness. Newton's procedural challenge involves two parts: First, she argues that the district court erred when it rejected her request for a downward adjustment under U.S.S.G. § 3B1.2 as a minimal participant. Second, Newton believes that the court erred when calculating Medicare's loss attributable to her under U.S.S.G. § 2B1.1(b)(1). We review Newton's procedural challenges, which concern the district court's assessment of the facts, for clear error, *United States v. Sanchez*, 989 F.3d 523, 543 (7th Cir. 2021), and her challenges to the sentence's reasonableness for abuse of discretion, *United States v. Morgan*, 987 F.3d 627, 632 (7th Cir. 2021).

The Guidelines advise courts to decrease the offense level if a defendant played either a minimal (four-level decrease) or minor (two-level decrease) role in the criminal activity. U.S.S.G. § 3B1.2. The "minimal participant" provision applies to those who are "plainly among the least culpable of those involved in the conduct of a group." *Id.* § 3B1.2 cmt. n.4. Meanwhile, the "minor participant" provision applies to those "who [are] less culpable than most other participants … but whose role could not be described as minimal." *Id.* § 3B1.2 cmt. n.5.

The district court gave Newton a two-level reduction as a "minor participant" in the conspiracy. Newton argues that she qualifies as a "minimal participant" because she was a low-level employee with no discretion over her work tasks, lacked knowledge of some aspects of the scheme, had no decision-making authority, and gained little from her

participation. But a defendant does not automatically qualify as a minimal, or even minor, participant in a conspiracy just because she did not reap substantial pecuniary gains. *United States v. Panaigua-Verdugo*, 537 F.3d 722, 725 (7th Cir. 2008); *see* U.S.S.G. § 3B1.2 cmt. n.3(A) ("A defendant who is accountable … for a loss amount … that greatly exceeds the defendant's personal gain … *may* receive an adjustment." (emphasis added)). Nor does a lack of decision-making authority or knowledge of the entire plan require a downward adjustment. *See* § 3B1.2 cmt. n.3(A) ("[A] defendant … who had limited knowledge of the scope of the scheme *may* receive an adjustment." (emphasis added)). Rather, an important consideration is whether the defendant played an essential role in the conspiracy. *United States v. Garcia*, 580 F.3d 528, 538–39 (7th Cir. 2009) ("A defendant who was an essential part of a conspiracy does not merit a role reduction simply because other members of the conspiracy were more involved.").

Here, the district court explained that although Newton did not benefit financially, she was still regularly involved in the criminal activity. And although she lacked knowledge about some aspects of the scheme, that was only because she purposely "[stuck] her head in the sand." We see no clear error in this characterization of the facts. The advisory guidelines and our caselaw do not entitle Newton to more than a minor participant reduction when she played an essential role in the conspiracy's day-to-day operations.

Newton's argument that the district court erred in calculating the loss amount attributable to her has more traction. Under the Sentencing Guidelines, a defendant's base level is increased according to the loss associated with the crime. U.S.S.G. § 2B1.1(b)(1); *United States v. Burns*, 843 F.3d 679, 688

(7th Cir. 2016). "Loss" in § 2B1.1(b)(1) is defined as "the greater of actual loss or intended loss." § 2B1.1 cmt. n.3(A). In this case, the parties and district court focused on only actual loss, defined as the "reasonably foreseeable pecuniary harm that resulted from the offense." *Burns*, 843 F.3d at 688 (quoting § 2B1.1 cmt. n.3(A)(i)). In conspiracy cases, the guidelines allow for the offense conduct of other members to be attributable to the defendant, but that conduct also must have been "reasonably foreseeable" to the defendant "in connection with [the] criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). The government has the burden to establish loss by a preponderance of the evidence, but "a reasonable estimate will suffice." *United States v. Gumila*, 879 F.3d 831, 834 (7th Cir. 2018). For Medicare fraud, a district court can reasonably count as loss any money that Medicare would not have paid if not for the fraud. *See United States v. Dehaan*, 896 F.3d 798, 808 (7th Cir. 2018). Together, this means that Newton can be held responsible for all Medicare payments fraudulently obtained as a result of the fraud so long as the government can show that the payments, and the conduct generating them, were reasonably foreseeable to Newton.

The district court determined that Newton is responsible for the entire actual loss of $6.3 million that the court found the conspiracy caused. The district court landed on its estimate by accepting the government's argument that the entirety of Medicare's billing during the conspiracy (roughly $7 million) should be counted less a 10% deduction to account for the possibility that some of Care Specialists' charges to Medicare had been legitimate. According to the court, the testimony of five Care Specialists employees in particular— Onate, Fia Rivera, Melanie Onal, Michelle Santos, and Anthony Demata—"supported that the overarching purpose of

[Care Specialists'] operation was Mr. Echavia's fraudulent scheme." But their testimony does not support such a sweeping finding.

While Onate testified extensively about the fraud that he observed, he only ever implicated Ferdinand and himself, not any other Care Specialists nurses. He explained that, after patient visits, he would fill out documentation claiming his patients were worse off than they really were, requiring additional care. Onate clarified that about 90% of his patients, in his estimation, were not homebound and therefore did not qualify for Medicare reimbursement. Further, he testified to having been asked by a few patients about being paid, alluding to them possibly receiving kickbacks, also something that would make the visits ineligible for reimbursement. While he said that he observed pre-signed blank patient notes in Newton's possession, those notes bore only Ferdinand's signature. And after Ferdinand was excluded from participating in Medicare, he would accompany only Onate on patient visits. Onate's testimony supports a conclusion that a significant amount of work that *Onate and Ferdinand* did was in pursuit of fraudulent Medicare reimbursements. But there were at least six other nurses who worked at Care Specialists during the relevant time and Onate connected none of them to the fraud.

Other witnesses likewise did not connect the vast majority of the nurses, or their work, to the fraud. For instance, Rivera, Onal, Santos, and Demata—all support staff who worked in the Care Specialists office with Newton—testified that they saw Newton filling out Ferdinand's patient notes, but none said that she did the same thing for other nurses. Indeed, Onal confirmed that she never saw anyone else ever fill in patient

notes for nurses. And when Rivera testified about Medicare rejecting claims because the claims asserted homecare was provided on a date the patient was actually hospitalized, she linked "only one nurse" to the issue: Ferdinand. None of these four witnesses ever implicated any nurses other than Ferdinand as engaging in fraud.

Again, this testimony reasonably supports a finding that most patient work performed by Onate and Ferdinand was not eligible for reimbursement by Medicare. But this represents a minority of the nursing staff, and we have no indication what portion of Medicare claims Onate's and Ferdinand's patients represented. The record, then, does not establish what proportion of the $7 million reimbursed by Medicare was for work performed by Ferdinand and Onate as opposed to the unimplicated nurses.[2] For us to conclude that the entire operation was fraudulent, except for 10%, we would have to speculate that nearly all nurses at Care Specialists, not just the handful of individuals identified by the government's

---

[2] In some cases, these potentially legitimate services might be tainted by the fraud if they were billed on behalf of a company owned by an individual subject to an exclusion that prevented any healthcare company merely associated with the individual from billing Medicare. *See United States v. Triana*, 468 F.3d 308, 320 (6th Cir. 2006). Here, however, Ferdinand transferred ownership of the company to his wife after his exclusion, and the exclusion "prohibited [Ferdinand] from submitting and causing claims to be submitted to [Medicare] for items or services which [he] provide[d]" or from indirectly doing work for services—such as by providing administrative, clerical, and other activities—provided to patients that Medicare would be charged for. Specifically, the government would not pay "for any items or services furnished, ordered, or prescribed by [Ferdinand] in any capacity."

witnesses, were involved in the same fraudulent activities as Ferdinand and Onate.

The government contends this would not be speculation, but rather in accordance with *Gumila* where we accepted as reasonable the district court's loss estimate based in part on an assumption that the entirety of the operation was fraudulent. But in *Gumila*, the district court considered evidence that the defendant had an express policy instructing her employees to only use the highest billing codes for all patients, regardless of the services rendered. 879 F.3d at 835. Similarly, Gumila instructed her employees to claim patients as homebound when they were not. *Id.* at 833. These universal policies gave the court a starting point to assume that nearly all patient visits had been fraudulently coded or did not otherwise qualify for Medicare reimbursement. *Id.* at 835–36.

Here, by contrast, there was no evidence of a similarly explicit, universal policy. The government presented evidence of significant fraud, but not evidence tainting all Medicare reimbursements. It proved that two out of the eight nurses at the company engaged in fraud. We can reasonably conclude that a significant amount of Onate's and Ferdinand's homebound patient care was ineligible for Medicare reimbursement because Ferdinand was ineligible to participate in Medicare, the patients were not homebound, Newton billed for unnecessary or nonexistent care, or the patients were receiving kickbacks. But this does not equate to, nor does anything suggest there existed, a universal policy instructing other nurses to engage in such fraud. Instead, we would have to speculate on the existence of a policy encouraging fraud because of Ferdinand's role at the company.

The district court seemed to do just that by pointing to Ferdinand's penchant for fraud and the integral role he played in Care Specialists' operations throughout the period of fraud, from 2011 to 2017. But after Ferdinand's exclusion from Medicare in 2014, his role seemed to be diminishing. The evidence shows he provided care only to Onate's patients during that period, not that he was otherwise involved in the care for all patients. The record does not support an assumption that 90% of billed care after 2014 was ineligible for Medicare reimbursement.

As for the period before Ferdinand's exclusion, there is little evidence to suggest that 90% of all that patient care was ineligible for reimbursement either. Santos testified that when she began working for Care Specialists in 2013, Ferdinand was the only nurse performing admissions. But this in and of itself does not make reimbursement fraudulent. Before 2014, Ferdinand was not excluded from Medicare so his involvement in admitting patients would not be a problem. And the record generally shows that he engaged in fraud with the patients he directly cared for, not necessarily with *all* patients he admitted and subsequently assigned to other nurses. While Onate testified that 90% of *his* patients were not homebound, nobody suggested a similar level of patients seen by other nurses were ineligible. For instance, another nurse told investigators that maybe up to 50% of his patients were not homebound. [3] The reasonable conclusion is that the Echavias funneled significantly more ineligible patients to the one nurse

---

[3] Nurse Ericson Magno, who did not testify, initially told investigators that 5%-10% of his patients were not homebound before later estimating up to 50% were not homebound. He explained the difference depended on how he interpreted the definition of homebound.

who had shown willingness to engage in fraud, while other nurses generally received a higher proportion of patients eligible for Medicare reimbursement.

Based on these facts, only speculation can support the district court's starting presumption that 90% of Medicare reimbursements to Care Specialists were fraudulent, regardless of which nurse performed the care. The calculation of the loss amount attributable to Newton was, therefore, clearly erroneous. *See United States v. Nelson*, 774 F.3d 1104, 1107 (7th Cir. 2014) ("A defendant is entitled to have sentencing determinations made based on reliable evidence rather than speculation or unfounded allegations.").

The government argues that even so, any error was necessarily harmless. But "[a]n error in calculating the sentencing guideline range is a procedural error that requires remand unless the government can show that the error is harmless." *United States v. Black*, 815 F.3d 1048, 1056 (7th Cir. 2016). The government's burden at this point is "to show that the sentence would have been the same absent the error." *Id.* The government asserts that the error is harmless because Newton cannot show that the loss amount attributed to her would have been less than $3.5 million. *See* U.S.S.G. § 2B1.1(b)(1)(J) (offense level increase the same for loss amount between $3.5 and $9.5 million). But the government misunderstands who has the burden to show that the sentence would have been the same, and it does nothing to attempt to explain what the proper loss calculation should be. This is a far cry from those cases where we held harmless an improper loss amount analysis because the record clearly indicated what the proper amount should have been. *See United States v. Hussein*,

664 F.3d 155, 160–61 (7th Cir. 2011); *United States v. Frith*, 461 F.3d 914, 918 (7th Cir. 2006).

Because we find that the district court erred procedurally, we must remand for resentencing. We leave to the district court's sound discretion whether revisiting the loss amount requires reexamining its restitution order. Additionally, because we are reversing on procedural grounds, we need not consider the substantive reasonableness of Newton's sentence. *See United States v. Lucas*, 670 F.3d 784, 789–90 (7th Cir. 2012) ("Our review of sentencing decisions proceeds through a two-step inquiry … [and] if we determine there was no procedural error, we then examine the substantive reasonableness of the sentence itself." (cleaned)).

## IV

For the above reasons, we AFFIRM Newton's conviction, but VACATE her sentence and REMAND for the district court to reconsider the loss amount attributable to her.