In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 23-3324

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

EARL MILLER,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:20CR00048-1 — **Jon E. DeGuilio**, *Judge.*

———————————

ARGUED SEPTEMBER 17, 2024 — DECIDED AUGUST 27, 2025

———————————

Before EASTERBROOK, HAMILTON, and MALDONADO, *Circuit Judges.*

MALDONADO, *Circuit Judge.* A federal jury convicted Earl Miller, owner of several real-estate investment companies, of wire fraud and securities fraud for stealing millions of dollars from his investors. The district court sentenced Miller to a below-guidelines term of 97 months' imprisonment. As part of its guidelines calculation, the district court determined that the intended loss caused by Miller's fraud was approximately

$4.5 million. That loss amount led to an 18-level sentencing enhancement. The district court further ordered that Miller pay restitution of $2.3 million to the victims of his scheme.

Miller now appeals his sentence. He argues that the district court committed reversible error in its loss-enhancement and restitution calculations and asks that we vacate the judgment and remand for resentencing. We find no such errors and therefore affirm Miller's sentence.

## I.   Background

**A. Factual Background of Offenses**

In 2009, Miller was hired by a childhood friend, Matthew Gingerich, to raise money for Gingerich's real estate investment firm, 5 Star Investments. 5 Star raised capital to finance the rehabilitation of properties, mostly in Northern Indiana where the company was based, by issuing promissory notes to investors in exchange for their contributions. These notes promised investors around 10% in returns paid out in monthly installments over 30 months, at which time the investors were promised to be paid their principal investment.

By 2011, Miller co-owned 5 Star with Gingerich and was solely responsible for the investor side of the business. In this role, Miller, with the assistance of 5 Star's legal counsel, prepared 5 Star's Private Placement Memoranda (PPMs), which served as investment contracts. The PPMs generally assured investors that 5 Star planned to use the funds for residential real estate investments and would not allocate them to non-real estate ventures without prior agreement. The PPMs included various other promises, including that Miller would not be paid a salary, that 5 Star would not advertise investment opportunities through general solicitation, and that

securities would be sold only to "accredited" or "sophisticated" investors.

In July 2014, Miller bought out Gingerich for $2.5 million and became the sole owner of 5 Star. By that time the business had grown into 15 related LLCs operating under the 5 Star name and expanded to include properties outside of Indiana. As the sole owner, Miller was responsible for both the investment and operations sides of the business. He also became the sole signatory on company checks and the sole decisionmaker regarding the spending of investor funds.

Shortly after Miller took over 5 Star, he began diverting investor funds for personal purposes contrary to the terms in the PPMs. Between July 2014 and August 2015, Miller used over $645,000 in investor money to help pay off his debt to Gingerich; he paid over $214,000 to a personal spiritual advisor; and he personally pocketed over $914,000 directly out of 5 Star accounts.

Also contrary to the PPMs, Miller ran advertising campaigns, which he mainly targeted toward the Amish community in Indiana. Many of the Amish investors that Miller targeted had an eighth-grade education and limited or no investing experience. Miller himself was raised in an Amish community.

Starting in February 2015, Miller also began to wire investor funds to various "green products" companies that were operated by his friends. Miller did no due diligence on these businesses, nor did he seek investor permission before making payments. Miller eventually developed and issued a new PPM in March 2015, which stated that 5 Star was expanding its business into green energy products, though, by then, he

had already transferred hundreds of thousands of dollars. Further, the new PPM included false statements about 5 Star's plans for those investments. For example, the PPM represented that 5 Star would use investor money to distribute green products for which 5 Star owned the patent. But 5 Star held no such patents and never had plans to distribute any such products. Miller ultimately wired over $1.7 million of investor money to his friends' companies, and the payments made little to no returns for investors.

By July 2015, 5 Star was struggling financially and it had stopped paying out returns to its investors, though Miller continued to solicit and accept new investments anyway. Around this time, Miller again used investor funds without authorization to hire a company, Global Impact, to take over the day-to-day management of 5 Star and turn the company around. Miller also used investor funds to hire a law firm, Cozen O'Connor, to handle legal issues. Soon after Global Impact was hired, with investors calling 5 Star's offices asking for their unpaid interest checks, Miller left town and took his family to Florida. While he was away, Miller continued to make wire transfers between and out of 5 Star accounts. Global Impact continued to run 5 Star until early 2016 when Miller filed for bankruptcy and a trustee assumed control of the 5 Star entities.

## B.  Trial Proceedings

In June 2020, a grand jury charged Miller with engaging in a scheme to commit wire fraud from July 2014 through August 2015 by misappropriating investor money. Counts 1 through 6 of the indictment alleged wire fraud in violation of 18 U.S.C. § 1343 and identified six victims whose investments were misused as part of Miller's scheme. The grand jury also

charged Miller with securities fraud and making a false statement during 5 Star's bankruptcy proceedings.

At trial, in addition to presenting testimony from victims and former 5 Star employees, the government called an FBI forensic accountant, Heather Teagarden, to testify as to 5 Star's books, investor funds, and expenditures. Teagarden testified that, based on her examination of 5 Star's records, Miller diverted $4,524,137.57 to himself or outside entities contrary to the terms of the PPMs. This $4.5 million figure included Miller's unauthorized payments to Gingerich, his spiritual advisor, his friends' green energy entities, Global Impact, Cozen O'Connor, and himself.

A jury convicted Miller on one count of securities fraud and five counts of wire fraud. It acquitted him on one wire fraud count relating to one victim who did not testify and on the false statement charge in connection with the bankruptcy proceedings. Miller filed a post-trial motion for acquittal, which the district court denied.

## C. Sentencing Proceedings

During the sentencing phase, the district court considered the application of § 2B1.1(b) of the Sentencing Guidelines, which adds escalating enhancements based on the amount of loss caused by the defendant's fraud. The Probation Department's presentence report (PSR) recommended a $30 million loss amount based on the total principal investments 5 Star had taken in and held at the time it went bankrupt. This would have resulted in a 22-level increase to the advisory guideline range. *See* U.S.S.G. § 2B1.1(b)(1)(L). Miller raised numerous objections to the loss amount in the PSR including, as relevant here, that the government had not shown that he

had the intent to defraud investors of the entire claimed loss amount. Miller instead argued that the loss amount should have been limited to the losses of the victims specifically charged in the counts of conviction and proven at trial, which he argued amounted to roughly $600,000 for a 14-level enhancement. *See* U.S.S.G. § 2B1.1(b)(1)(H).

In a written decision, the district court rejected both sides' proposed loss amounts and came to its own determination. The court calculated the intended loss at $4.5 million, the amount Teagarden testified that Miller had misappropriated. It emphasized that Miller made no attempt during trial to dispute Teagarden's calculation of his misspending, which was supported by 5 Star's bank records. The district court concluded that this figure represented the intended financial harm caused by Miller's offense, because it reflected the money that Miller fraudulently spent in violation of the terms of the PPMs. This loss amount led to an 18-level sentencing enhancement. *See* U.S.S.G. § 2B1.1(b)(1)(J).

At that time, the district court deferred setting a restitution amount until the government provided more information identifying the particular investors who lost money from Miller's misspending, and whether they had been reimbursed at all. The government then supplemented the record with this additional evidence and sought restitution in the amount of $2,313,873.28 for forty-five victims. The government proffered that Teagarden would testify that she had traced the investments of those forty-five investors to the money that Miller misspent, and that the $2.3 million figure represented those victims' net loss after accounting for any money they had received back in interest payments or from the bankruptcy proceedings. Miller stipulated to the $2.3 million

figure as factually accurate but nonetheless objected to paying restitution. Miller maintained, similar to his loss amount argument, that the evidence did not support restitution for any victims beyond those identified in the indictment and specifically proven at trial. The court rejected Miller's objection, noting that the evidence at trial established that Miller was defrauding clients over the lifetime of the fraudulent scheme, and that he was responsible for restitution to all the victims harmed during that scheme.

The district court ultimately determined that Miller's sentencing range under the Guidelines was 168 to 210 months' imprisonment. The district court varied downward five levels based on historical sentencing data for comparable crimes and sentenced Miller to a term of 97 months' imprisonment. The court then imposed the stipulated restitution figure of $2.3 million.

## II. Analysis

Miller challenges the district court's loss calculation of $4.5 million and the corresponding 18-level sentencing enhancement as unsupported by the record. He also appeals the evidentiary basis of the court's $2.3 restitution award. We address each issue in turn.

### A. Calculation of Loss

Section 2B1.1(b)(1) of the Sentencing Guidelines provides that, for certain crimes such as wire fraud, the defendant's base offense level is increased according to the "actual loss" or "intended loss" associated with the crime, whichever amount is greater. *United States v. Newton*, 76 F.4th 662, 672 (7th Cir. 2023) (citations omitted). Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted

from the offense." *Id.* (citing U.S.S.G. § 2B1.1(b)(1) cmt. n.3(A)(i) (2021)). Intended loss, on the other hand, is "the pecuniary harm that the defendant purposely sought to inflict." U.S.S.G. § 2B1.1(b)(1) cmt. n.3(A)(ii) (2021). "Because the offense of wire fraud is a scheme, the loss amount can include losses incurred in the entire scheme, not just losses from the individual transactions specified in the indictment." *United States v. Meza*, 983 F.3d 908, 916 (7th Cir. 2020). Courts will therefore "aggregate losses to victims of the same course of conduct or common scheme or plan as the offense of conviction." *Id.* at 915–16 (cleaned up).

The government bears the burden of establishing the loss amount at sentencing by a preponderance of the evidence, but the district court is only obligated to make a "reasonable estimate" of loss based on the available evidence. *See Newton*, 76 F.4th at 672; U.S.S.G. § 2B1.1 cmt. n.3(C) (2021). We review the district court's methodology for calculating loss de novo, but we review its ultimate calculation for clear error. *See, e.g.*, *United States v. Yihao Pu*, 814 F.3d 818, 823 (7th Cir. 2016). "A defendant challenging a loss calculation bears a heavy burden: he must show that the court's loss calculations were not only inaccurate but outside the realm of permissible computations." *United States v. Kyereme*, 127 F.4th 702, 706 (7th Cir. 2025) (cleaned up).

Here the district court correctly concluded that the intended loss caused by Miller's fraudulent scheme was $4.5 million, the amount of money that Teagarden testified Miller misappropriated from 5 Star accounts. This figure—which Miller concedes was all misspent—strikes us as an eminently reasonable estimate of the harm that Miller sought to inflict on investors. Miller solicited funds from inexperienced

investors in his own community who expected their money would not be used for any purpose other than real-estate investments pursuant to the terms of the PPMs. And yet Miller intentionally diverted $4.5 million from 5 Star to himself and to unauthorized third parties for his own purposes and to enrich his friends. Even when Miller eventually distributed a new PPM informing his clients about the green product investments, he still deceived investors about the nature and purpose of the investments. We struggle to see a more straightforward and sensible estimate of the harm that Miller intended to cause than the total amount of money that he stole and misused contrary to his promises to investors. *See, e.g., United States v. Moose*, 893 F.3d 951, 955 (7th Cir. 2018) (affirming loss calculation of $480,000 as "easy to understand" where the defendant "invested only $200,000 as promised of the $680,000 he persuaded investors to entrust to him and pocketed the other $480,000").

Miller's arguments to the contrary are unconvincing. First, he argues that the $4.5 million figure is inflated because it includes money that was invested in 5 Star before he took over as sole owner on July 29, 2014, the date that the indictment alleges he began his scheme to deceive investors. As Miller sees it, 5 Star was operating as a legitimate business before this point, so any money invested during this period should not be considered as part of the loss amount, even though he later misspent that money during his fraudulent scheme. But this argument faces obstacles in our case law.

We take it as true that some of the misspent money came into the business before Miller took over sole ownership in July 2014. But that does not matter to our analysis. We have repeatedly held that we generally calculate intended loss "by

considering the amount the defendant placed at risk with the fraudulent scheme." *United States v. Klund*, 59 F.4th 322, 327 (7th Cir. 2023) (citing *United States v. Durham*, 766 F.3d 672, 687 (7th Cir. 2014) (collecting cases)); *see also United States v. Lauer*, 148 F.3d 766, 768 (7th Cir. 1998) ("[T]he amount of the intended loss, for purposes of sentencing, is the amount that the defendant placed at risk by misappropriating money or other property. That amount measures the gravity of his crime."). We look to the entire amount placed at risk because "the purpose of fraud statutes is to punish the scheme, not simply the unlawful taking of money or property." *United States v. Stochel*, 901 F.3d 883, 890 (7th Cir. 2018) (cleaned up); *see also United States v. Mei*, 315 F.3d 788, 792 (7th Cir. 2003) (noting that we look to the amount placed at risk in fraud cases "because the actual amount of money or property obtained generally understates the true financial loss").

It therefore makes no difference whether some of the $4.5 million in misspent funds was originally invested in 5 Star for legitimate purposes, because Miller undoubtably placed that money at the same risk of loss as the investments that came in after July 2014. That is, Miller intentionally placed the entire $4.5 million at risk of loss through his same unlawful common course of conduct of misappropriating investor money for unauthorized purposes. That entire amount is thus properly considered intended loss. *See Lauer*, 148 F.3d at 768. At the very least, it is a reasonable estimate of the loss, which is all that is required. *See Newton*, 76 F.4th at 672.[1]

---

[1] In fact, $4.5 million may be a conservative estimate of the amount that Miller placed at risk. Recall that probation recommended a loss amount of $30 million, equating to the value of investments 5 Star had

Second, Miller argues that the district court failed to trace the entire $4.5 million in misspent funds back to the individual investors from whom the money originated. He contends that the district court needed to conduct an individualized inquiry to determine whether he defrauded each investor at the time they made their investment. Without such findings, Miller maintains that the evidence supports a loss amount only tied to the investments of the five victims proven at trial, which he estimates as no more than approximately $500,000.

Our case law squarely rejects this contention. In calculating the amount placed at risk for purposes of intended loss, "neither the text of the Guidelines nor the relevant case law requires the government or the court to identify who, or what entity, was at risk." *See United States v. Tartareanu*, 884 F.3d 741, 745 (7th Cir. 2018) (citing *United States v. Betts–Gaston*, 860 F.3d 525, 539 (7th Cir. 2017)). To be sure, identification of specific victims is necessary when it comes to calculation of restitution awards, which must be based on the victims' "actual loss." *See infra* at 13. But there is no such requirement for

---

taken in from 470 investors over the life of the business at the time of its bankruptcy. Those investors received only a small portion of their contributions back though returns or bankruptcy. The district court found this larger loss figure unsupported because the government had not adequately shown that Miller's embezzlement caused the business to collapse. But it is at least arguable that Miller's fraud placed $30 million at risk. Alternatively, the record also indicates that 5 Star took in approximately $10 million from some 70 investors during the indictment period alone. Teagarden was only able to trace $4.5 million of that to misspending, but given the evidence that Miller was defrauding investors during the lifetime of his scheme, it could again be argued that he placed $10 million at risk. At a minimum, these higher figures show that the district court exercised considerable restraint in limiting loss to that which could be conclusively tied to unauthorized expenditures.

intended loss, which is aimed at measuring the gravity of the fraudulent scheme as a whole, not the particular loss of money or property by individual victims. *See, e.g.*, *Meza*, 983 F.3d at 915. The district court was therefore not required, when calculating loss, to identify individual victims or find that each one was specifically defrauded when they made their investment.

Miller resists this conclusion by pointing to our precedent, but the principal cases he relies on, *United States v. Schaefer*, 291 F.3d 932, 937–40 (7th Cir. 2002), and *United States v. Chube II*, 538 F.3d 693, 702 (7th Cir. 2008), are inapposite. In both, we reversed and remanded sentencing enhancements because the district courts failed to adequately explain the basis of their decisions and to cite facts demonstrating that the enhancements were based solely on conduct that was unlawful. These concerns are not present here where the district court adequately explained how it reached its conservative $4.5 million loss figure, which it reasonably concluded reflected the amount of money misspent as part of the same unlawful course of conduct.

Finally, to the extent that Miller suggests that his unauthorized spending—such as his investments with his friends' green energy companies or his other legitimate real estate investments—might have yielded sufficient returns to investors to cover what he misspent, that does not impact the intended loss analysis. We have previously explained that "[m]any embezzlers intend to pay back the money they have stolen," but such an individual is "nevertheless an embezzler to the full extent of the amount he took, no matter how golden his intentions or happy the consequences." *Moose*, 893 F.3d at 956 (quoting *Lauer*, 148 F.3d at 768). Of course, any returns to

victims must be accounted for in restitution (which it was here). But intended loss is different. Whatever Miller hoped to gain by diverting money to his friends' businesses or outside firms like Global Impact, the intended loss includes the full amount of money he spent in violation of his promises to investors.

In sum, we find no error in the district court's calculation of $4.5 million in intended loss, which represents a reasonable estimate of the amount placed at risk by Miller's fraudulent scheme.

## B. Restitution Amount

Miller also challenges the district court's restitution award. The Mandatory Victim Restitution Act mandated restitution "in the full amount of each victim's losses" because Miller was found guilty of wire fraud. 18 U.S.C. §§ 3663A(c)(1)(A)(ii), 3664(f)(1)(A). For restitution purposes, the district court may only use the actual loss amount, which accounts for funds already returned to victims or received through mechanisms such as bankruptcy proceedings. *See United States v. Allen*, 529 F.3d 390, 396–97 (7th Cir. 2008). Restitution is appropriate not only for the victims identified in the charges of conviction but also for victims of the overall scheme. *United States v. Locke*, 643 F.3d 235, 247 (7th Cir. 2011) ("As long as the sentencing court can adequately demarcate the scheme, it can order restitution for any victim harmed by the defendant's conduct during the course of that scheme.") (cleaned up).

We review the district court's restitution award for abuse of discretion. *United States v. Betts*, 99 F.4th 1048, 1060 (7th Cir. 2024). The government bears the burden of showing by a

preponderance of the evidence that the victim's actual losses were "directly and proximately caused" by the defendant's scheme. *Id.* at 1061.

Miller's arguments challenging the restitution figure are difficult to follow, given his concession that $2.3 million accurately reflects the investments made during the indictment period (after accounting for any returns or bankruptcy payments received by investors). As best as we can tell, Miller raises essentially the same argument as above, faulting the district court for not making findings that Miller intentionally defrauded each of the proposed restitution victims at the time of their investment. Here too, this argument fails.

The district court appropriately found, based on the evidence accepted by the jury, that Miller perpetrated a scheme to defraud investors between July 2014 and August 2015 by spending some $4.5 million contrary to the promises made to investors in the PPMs. Miller was therefore liable to pay restitution to all victims that were harmed by his same scheme of misspending money, not just to those five victims who testified at trial and for whom Miller's fraud was specifically proven. *See Locke*, 643 F.3d at 247. Again, the purpose of the fraud statutes is to punish the entire scheme to defraud, "not just the isolated iterations of wire transmissions or mailings," which is why "restitution for victims of the overall scheme is required." *Id.* Miller does not argue that the district court erred in how it described his scheme, nor does he dispute the accuracy of Teagarden's proffered testimony that all forty-five victims' investments were traced to his $4.5 million in embezzled funds. Instead, he essentially suggests that the government must prove all the same elements necessary for

conviction for each individual victim before they can receive restitution.

That is not the law. *See id.* ("[W]here a defendant is convicted of defrauding person X and a fraudulent scheme is an element of that conviction, the sentencing court has power to order restitution for the loss to defrauded person Y directly caused by the defendant's criminal conduct, even where the defendant is not convicted of defrauding Y." (quoting *United States v. Kones*, 77 F.3d 66, 70 (3d Cir. 1996))). It was enough that the district court found that all forty-five victims were harmed by Miller's same unlawful conduct of misappropriating investor funds, a finding that was amply supported by the record. The district court therefore did not abuse its discretion in its restitution award.

### III. Conclusion

For the foregoing reasons, we find no errors in the district court's loss amount or restitution calculation. Accordingly, we AFFIRM the judgment of the district court.